**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHRANDA CAMPBELL-SALAHUDDIN, | ) | |
| | ) | |
| | ) | **Case No. 18-CV-00268** |
| Plaintiff, | ) | |
| | ) | **Hon. Virginia Kendall** |
| v. | ) | |
| | ) | |
| FORD MOTOR COMPANY; | ) | |
| UNITED AUTO WORKERS | ) | |
| LOCAL 588; and INTERNATIONAL | ) | |
| UNION, UNITED AUTOMOBILE, | ) | **Jury Trial Demanded** |
| AEROSPACE AND AGRICULTURAL | ) | |
| IMPLEMENT WORKERS OF | ) | |
| AMERICA (UAW), AFL-CIO, | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT TO VACATE ARBITRATION AWARD

The Plaintiff, Shranda Campbell-Salahuddin, hereby seeks to overturn, vacate and

set aside the Arbitration Award entered by Arbitrator Kathryn A. VanDagens on December

13, 2017 pursuant to Section 301 of the Labor Management Relations Act (29 U.S.C. §

185) and the standards imposed by or derived from the Federal Arbitration Act, and states:

1.      This is a proceeding to set aside the Arbitration Award and to remand

pursuant to Section 301 of the Labor Management Relations Act (29 U.S.C. § 185)

("Section 301")[1] for rehearing and a fair and impartial Arbitration ruling free of

corruption, fraud or undue means and free of evident partiality or corruption in the

arbitration process.

---

[1] Plaintiff's claim is pursuant to Section 301. There is a Circuit split as to whether the standards of fairness imposed by or derived from the Federal Arbitration Act (9 U.S.C. § 10(a)(1)-(2)) ("FAA")) should be applied to arbitrations at issue in Section 301 complaints and for purposes of preserving this issue on appeal,

## THE PARTIES

2.     Plaintiff, Shranda Campbell-Salahuddin ("Salahuddin") is a resident and citizen of Schererville, Indiana.

3.     Defendant Ford Motor Company ("Ford") operates the Ford Chicago Stamping Plant (the "Stamping Plant") in Cook County, Illinois and within this judicial district.

4.     Defendant The United Automobile, Aerospace and Agricultural Implement Workers of America ("International UAW") is a labor union with a primary place of business located at 8000 East Jefferson, Detroit, Michigan.

5.     Defendant United Auto Workers Local 588 (the "Local UAW") is a local branch of The United Automobile, Aerospace and Agricultural Implement Workers of America labor union with a primary place of business located at 21540 Cottage Grove Avenue, Chicago Heights, Illinois, and within this judicial district.

## JURISDICTION AND VENUE

6.     Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331 and 29 U.S.C. § 185 as this matter involves a federal question.

7.     Venue is proper in this district under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in Chicago, Illinois and/or Chicago Heights, Illinois and were all within the Northern District of Illinois and Defendants Ford and Local UAW reside in this judicial district and International UAW does business in this judicial district.

---

Plaintiff alleges that the standards imposed by the FAA should be considered when evaluating a Section 301 Complaint, and that Defendants' actions deprived Plaintiff of a fair and impartial arbitration.

8.      The Ford Stamping Plant manufactures automobile parts and components.

9.      The Ford Stamping Plant is located in Chicago Heights, Illinois, in the Northern District of Illinois, and regularly does business in Illinois.

10.     Ford regularly does business in the Northern District of Illinois and is therefore a "resident" of the Northern District of Illinois for purposes of venue.

11.     Defendant International UAW is a labor union representing hourly workers directly, and through its local chapter, the Local UAW.

12.     The International UAW and Local UAW both represent union members who work at Ford's Chicago Stamping Plant.

13.     The International UAW and Local UAW represent Chicago Stamping Plant union members in union disputes in the Northern District of Illinois.

14.     The International UAW regularly does business in the Northern District of Illinois and is therefore a "resident" of the Northern District of Illinois for purposes of venue.

15.     The Local UAW regularly does business in the Northern District of Illinois and is therefore a "resident" of the Northern District of Illinois for purposes of venue.

16.     Plaintiff Salahuddin was a member of Defendant International UAW.

17.     Plaintiff Salahuddin was a member of the Local UAW.

18.     As of August 29, 2016, Plaintiff had worked for Ford Motor Company for approximately sixteen (16) years.

19.     As of August 29, 2016, Plaintiff was working at Ford's Chicago Stamping Plant.

20.     On or about August 29, 2016, Ford terminated Plaintiff's employment.

21.     Plaintiff grieved her discharge from Ford.

22.     Plaintiff's grievance was permitted pursuant to the International UAW and Ford's Collective Bargaining Agreement.

23.     Plaintiff began the grievance process on August 29, 2016.

24.     Plaintiff initially grieved her discharge with the assistance of the Local UAW.

25.     Plaintiff initially grieved her discharge through the Local UAW.

26.     Plaintiff's grievance resulted in an arbitration hearing (the "Arbitration") on or about October 17, 2017.

27.     Arbitrator Katheryn A. VanDagens ("VanDagens") conducted the Arbitration.

28.     Arbitrator VanDagens practices law in Chicago Illinois.

29.     Arbitrator VanDagens conducts arbitrations in Chicago Illinois.

30.     Arbitrator VanDagens regularly does business in the Northern District of Illinois.

31.     The arbitration in this matter took place in the Northern District of Illinois.

32.     Jurisdiction and venue are appropriate in the Northern District of Illinois.

**COUNT I**
**VIOLATION OF SECTION 301 OF THE LABOR**
**MANAGEMENT RELATIONS ACT (29 U.S.C. § 185)**
(by Plaintiff against all Defendants)

33.     Plaintiff incorporates all allegations included as paragraphs 1-32 as and

for this paragraph.

**A. FORD BREACHED ITS CONTRACTUAL OBLIGATIONS**
   **UNDER THE COLLECTIVE BARGAINING AGREEMENT**
   **BY TERMINATING PLAINTIFF WITHOUT CAUSE**

34.     In 2015, Ford and the International UAW executed a contract titled:

Agreements Between the UAW and the Ford Motor Company (hereafter, "Collective

Bargaining Agreement" or "CBA").

35.     Ford had a duty to honor its obligations under the CBA with respect to

UAW members' workplace rights.

36.     As part of the CBA, Ford and the IUAW agreed that Ford only had

unilateral authority to discipline and discharge employees if the discipline and

discharge was "for cause":

> The Company retains the sole right to discipline and discharge
> employees for cause, provided that in the exercise of this right it will not
> act wrongfully or unjustly or in violation of the terms of this
> Agreement…Complaints that the Company has violated this paragraph
> may be taken up through the Grievance Procedure provided in this
> Agreement.

CBA, at Art. IV, Sec. 3 (Discipline and Discharge (Vol. I, p. 17)).

37.     When Ford terminated Plaintiff, it breached its obligations under CBA Art.

VII, Sec. 3 by terminating Plaintiff without cause where:

a. Ford failed to prove accusations that Plaintiff "bumped" another person at Ford's Stamping Plant;

b. Evidence and testimony corroborated that Plaintiff was not at the alleged scene of the alleged "bumping" event;

c. Ford failed to prove accusations that any "bump" was "intentional";

d. The discipline issued to Plaintiff was not reasonable and consistent within Ford's Stamping Plant's standard discipline for similar charges;

e. Ford's investigation was biased against the Plaintiff;

f. Ford disregarded Miguel Astorga's and Herbert Simpson's interview statements which did not support for Ford's decision to terminate Plaintiff;

g. Ford did not interview identified witnesses Mike (the Company hourly team leader), Dede Perkins and Loretta to determine if Plaintiff complained about the uncleanliness of the women's bathrooms or whether cleaning personnel who complained about Plaintiff had a motive to fabricate allegations against her;

h. Grant Crowley, the reviewing Labor Relations representative who interviewed witnesses recommended that Plaintiff not be terminated based on the testimony he obtained;

i. Ford's records indicate that it summarily terminated Plaintiff or intended to do so on August 26, 2016 - even before Plaintiff's in-plant hearing;

j. Ford's records indicate its bias against her where it determined Plaintiff was terminated August 26, 2016 - several days before her August 29, 2016 in-plant hearing at which she was informed of her termination.

*See*, UAW Post Hearing Brief ("Ex. A").

38.     By breaching the CBA and terminating Plaintiff without cause, Ford

caused Plaintiff to suffer damages, including lost wages, the value of lost benefits, pain,

suffering and emotional distress.

## A BIASED ARBITRATOR INSTEAD OF A DESIGNATED "UMPIRE" WAS SELECTED TO ARBITRATE PLAINTIFF'S FOURTH STAGE GRIEVANCE

39.     Pursuant to the CBA, Ford and the IUAW also agreed:

> When an employee . . . has a grievance against the Company, it shall be processed in accordance with the Grievance Procedure hereinafter provided.

*   *   *

CBA, at Art. VII, Sec. 1 (Vol. I, at p. 45).

40.     Plaintiff, through the Local UAW filed a grievance that her rights under

Art. IV, Sec. 3 of the CBA were violated.

41.     When a grievance gets to the "Fourth Stage" of the grievance process,

the CBA provides it may be appealed to an "Umpire":

> If a satisfactory disposition is not made of a grievance by the Review Board and if the grievance is the type of case upon which the Umpire is empowered to rule, the case may be appealed by the National Ford Department of the International Union to the impartial Umpire hereinafter provided for, in accordance with the following provisions . . .

CBA, at Art. VII, Sec. 8 (Vol. I, at p. 53).

42.     When Plaintiff's grievance reached the end of the Third Stage in the

grievance process, the International UAW and the Local UAW, on behalf of Plaintiff

appealed the matter to the Umpire.

43.     The International UAW, through its representative Reggie Ransom

prepared Plaintiff's Fourth Stage Grievance.

44. The Local UAW served as the nominal party with respect to Plaintiff's Fourth Stage grievance.

45. Plaintiff remained the real party-in-interest with respect to her Fourth Stage Grievance.

46. At a Fourth Stage Grievance, the CBA requires the parties use one of specifically designated persons as an "Umpire":

> The Umpire shall maintain an office where all notices and briefs required to be filed with him may be delivered.

CBA, at Art. VII, Sec. 12 (Vol. I, at p. 55).

> The parties shall establish a schedule of Umpire hearings which assures that all Units with pending cases are accorded equality of opportunity to have cases heard by the Umpire. . . .

CBA, at Art. VII, Sec. 13(a) (Vol. I, at p. 56).

> The Umpire may make such investigation as he/she may deem proper. The Umpire will hold hearings open to the parties and may examine the witnesses of each party and each party shall have the right to cross-examine all witnesses produced and to make a record of such proceedings.

CBA, at Art. VII, Sec. 13(b) (Vol. I, at p. 56).

> It shall be the obligation of the Umpire to the Company and the Union to rule on cases heard by him/her within thirty (30) days after the hearing. **Priority shall be given to deciding discharge cases.** If, for good and proper reasons additional time is required, the Umpire may request an extension of the time limits set forth above by the parties and a reasonable extension thereof shall be granted.

CBA, at Art. VII, Sec. 14 (Vol. I, at p. 56) (emphasis added).

47. Ford and the Local UAW and International UAW did not present Plaintiff's Fourth Stage Grievance to the Umpire designated by the CBA.

48.     As of the date Plaintiff's Fourth State Grievance was presented, Ford failed to employ a permanent Umpire as contemplated by and in further violation of the CBA.

49.     As of the date Plaintiff's Fourth State Grievance was presented, Ford failed to employ a permanent Umpire who was to have "priority" over arbitrating discharge cases.

50.     A person other than the "Umpire" was selected to arbitrate Plaintiff's Fourth Stage Grievance.

51.     Arbitrator VanDagens was selected to arbitrate Plaintiff's Fourth Stage Grievance.

52.     VanDagens served as the arbitrator (the "Arbitrator") in that matter.

## B. THE IUAW AND LOCAL UAW UNFAIRLY REPRESENTED PLAINTIFF

53.     Prior to her termination, Plaintiff had repeatedly complained about harassment and discrimination against Ford Motor Company dating back to 2013. These complaints included unwelcome and unwanted sexual advances, groping, inappropriate physical touching, and other types of discriminatory and harassing conduct.[2]

---

[2]     The Plaintiff is not making a "claim" of harassment or retaliation in this case but is simply including these factual allegations as background information to establish a motive of why the union discriminated against the Plaintiff and made the conscious and arbitrary decision to afford her improper and inadequate representation. Plaintiff's claims of harassment, discrimination and retaliation against Ford Motor Company are contained in *Van et al v. Ford Motor Company*, case no. 14 CV 8708 (N.D. Ill.).

54.     Plaintiff repeatedly complained to the UAW, including to Local UAW Building Chairman, Matt Kolanowski ("Kolanowski") that Ford was discriminating and retaliating against her.

55.     Plaintiff submitted numerous complaints about fellow union employees and management to both the union and Ford.

56.     Plaintiff's complaints included that:

a.  UAW members sexually and racially harassed her;

b.  The UAW failed to take steps to protect her;

c.  The UAW failed to advocate on her behalf when Ford's Labor Relations Department questioned her about her allegations;

d.  The union mishandled evidence, and failed to preserve and/or present Plaintiff's evidence supporting her allegations of sexual or racial harassment.

57.     As a result of Plaintiff's complaints, the UAW and its officials, including Chairman Kolanowski became tired of the Plaintiff's complaints and were frustrated by her continued complaints about fellow UAW members.

58.     After Plaintiff joined in the Federal Lawsuit, UAW officials, including Reggie Ransom and Matt Kolanowski told her that her lawsuit was going to "get the plant shut down."

59.     When Plaintiff continued to complain about other union employees, the UAW acted arbitrarily and refused to adequately represent Plaintiff in a subsequent matter.

60.     In 2016, Plaintiff complained that the female restroom was unkempt and unsanitary.

61.　Plaintiff was not aware of who the personnel were that were responsible for cleaning the restroom, but later learned that a Ms. Kasha Lee "got in trouble" because of Plaintiff's complaint.

62.　Plaintiff did not know Ms. Lee and had not knowingly interacted with Ms. Lee at work.

63.　Ms. Lee is also a union employee.

64.　Ms. Lee wrote a false statement against Plaintiff alleging Plaintiff confronted and "bumped" her at work.

65.　Ms. Lee falsely alleged that this occurred at or around 2:15 p.m. on June 22, 2016.

66.　Plaintiff did not interact with Ms. Lee on June 22, 2016.

67.　On June 22, 2016, from at least 2:00 p.m., and continuing throughout that shift, Plaintiff was at her work station in plain view of co-worker Kimberley Sykes.

68.　Supervisor Tom Nichols was aware Plaintiff was working on that shift at the 2:00 p.m. start of the shift.

69.　Nichols supervised her on the line until he was replaced later that afternoon by Supervisor Kevin Daniels.

70.　Labor Relations Representative Grant Crowley investigated Ms. Lee's complaint.

71.　Crowley refused to take a statement from either Kimberly Sykes or Tom Nichols in connection with Ford's investigation of Ms. Lee's complaint.

72.　Crowley recommended that Plaintiff should not be terminated.

73.    Crowley's superiors overrode his recommendation and instructed that Plaintiff be terminated because of their discriminatory animus toward Plaintiff.

74.    When Ford terminated Plaintiff, purportedly based on Ms. Lee's complaint, the UAW consciously decided not to negotiate Plaintiff's reinstatement.

75.    UAW Chairman Matt Kolanowski told Plaintiff that he negotiated the reinstatement of Dina Parker and Vernessa Burkes who had been terminated for physical altercations at work.

76.    Kolanowski told Plaintiff he could have negotiated Plaintiff's reinstatement.

77.    Kolanowski told Plaintiff if he negotiated her reinstatement, that saving her would have meant that someone else would have been fired.

78.    The UAW acted in a conflict of interest to choose other employee(s) over Plaintiff instead of negotiating that Plaintiff be reinstated.

79.    The Local UAW's conscious decision not to negotiate Plaintiff's reinstatement because she complained about workplace problems was arbitrary.

80.    The Local UAW's conscious decision not to negotiate Plaintiff's reinstatement because she complained about workplace problems more than other employees was irrational.

81.    The Local UAW's conscious decision not to negotiate Plaintiff's reinstatement was an intentional and discriminatory action taken against Plaintiff in bad faith because Plaintiff complained too much about observed workplace problems.

82.    The UAW acted arbitrarily toward Plaintiff.

12

83.     The UAW's conduct toward the Plaintiff was irrational.

84.     Plaintiff continued through the CBA process and proceeded to arbitration.

85.     Beginning at least by June, 2017, and continuing through November, 2017, Plaintiff met with Ransom in person and telephonically and discussed her Fourth Stage Grievance and upcoming arbitration with him on numerous occasions.

86.     From at least June, 2017 to November, 2017, Plaintiff repeatedly asked Ransom for information about the arbitrator.

87.     On or about June 13, 2017, Ransom learned that the Arbitrator had a brother who worked in upper management at Ford.

88.     Ransom also knew that Plaintiff was scheduled to be deposed on June 27, 2017 in *Van et al v. Ford Motor Company*, 14 CV 8708.

89.     Ransom kept the fact that the Arbitrator had a brother who worked in upper management at Ford from Plaintiff so that it would not serve as another basis on which she could testify against Ford in her deposition in that matter.

90.     From at June, 2017 and continuing until December, 2017, Ransom repeatedly falsely told Plaintiff that he did not know anything about the Arbitrator.

91.     From at least June, 2017 to November, 2017, Ransom told Plaintiff that the Arbitrator was "new."

92.     From at least June, 2017 to at least November, 2017, Ransom told Plaintiff that Plaintiff's arbitration was VanDagens' first Ford/UAW arbitration.

93.     From at least June, 2017 to at least November, 2017, Ransom told Plaintiff "nobody knows anything about her" [the Arbitrator].

13

94.     Local UAW Representative Matt Kolanowski ("Kolanowski") attended Plaintiff's Arbitration.

95.     At the conclusion of the Arbitration hearing, Kolanowski gave Arbitrator VanDagens a ride to her vehicle.

96.     During the course of the drive, VanDagens informed Kolanowski that her brother worked at Ford.

97.     Following Plaintiff's Arbitration in October, 2017, and continuing through at least November, 2017, Plaintiff repeatedly asked Kolanowski what he knew about the Arbitrator.

98.     From October, 2017, and continuing through at least November, 2017, Kolanowski repeatedly told Plaintiff that he did not know anything about the Arbitrator.

99.     The Arbitrator issued the Arbitration Award on December 13, 2017.

100.    After the Arbitrator issued the Award, Kolanowski told Plaintiff that:

    a.  VanDagens informed him that VanDagens' brother worked at Ford;

    b.  he had actually been aware VanDagens' brother was a Ford employee for more than a month prior to the Award being issued;

    c.  he had talked with Reggie Ransom about VanDagens' brother being a Ford employee and:

        1   Reggie discouraged Kolanowski from sharing this information with Plaintiff;

        2   Reggie told Kolanowski he would deny knowing about the Arbitrator's conflict-of-interest.

101.    In December, 2017, after the Arbitrator issued her award, Ransom told Plaintiff that:

a.  the Arbitrator had a conflict of interest with an upper-management employee at Ford;

b.  the Arbitrator had a brother who was an upper-level manager at Ford;

c.  he had not objected to the conflict of interest;

d.  the arbitration was final;

e.  he would not assist Plaintiff in appealing the matter any further because if he did, he would lose his job.

102.   The CBA allows

The impartial Umpire shall be a person jointly selected by the parties and shall continue to serve only so long as he/she continues to be acceptable to the parties.

CBA, at Art. VII, Sec. 21 (Vol. I, at p. 59).

103.   The CBA provides for the termination of an Umpire where:

(a) **Notice**. If at any time, either party desires to terminate the service of the Umpire, it shall give notice in writing to that effect, specifying the date of termination, and sending one copy to the Umpire and one copy to the other party.

(b) **Disposition of Pending Cases**. The party terminating the Umpire's services shall specify in its notice whether or not it is agreeable to have said Umpire render decisions in all cases pending before him/her up to the date of said termination, and if it determines that the Umpire may decide such pending cases, the Umpire shall render decisions thereon not later than thirty (30) days from the date of such notice.

If the party terminating the services of the Umpire elects not to have the cases pending before him/her decided by that Umpire, he/she shall render no further decisions subsequent to the time fixed in the notice, and all cases then pending before him/her shall be referred to his/her successor or to any other person the parties may agree on.

CBA, at Art. VII, Sec. 22 (Vol. I, at p. 59-60).

104.  The IUAW and Local UAW intentionally concealed and knowingly withheld the Arbitrator's conflict of interest from Plaintiff until after the Arbitration Award was issued.

105.  The IUAW and Local UAW intentionally concealed and knowingly withheld the Arbitrator's conflict of interest from Plaintiff until after it was "too late" to object to the Arbitrator pursuant to Sections 21 and 22 of the CBA.

106.  The IUAW and Local UAW intentionally concealed and knowingly withheld the Arbitrator's conflict of interest from Plaintiff until the arbitration was "final."

107.  The IUAW had a duty to fairly represent the Plaintiff at her Arbitration.

108.  The IUAW breached its duty of fair representation to the Plaintiff where it:

   a.  Informed Plaintiff that it was not aware of the Arbitrator's conflict-of-interest and partiality;

   b.  Failed to inform Plaintiff of the Arbitrator's conflict-of-interest and partiality;

   c.  Failed to object to the Arbitrator;

   d.  Agreed to the Arbitrator without disclosing the conflict-of-interest;

   e.  Failed to Notice the Arbitrator's termination.

109.  The Local UAW had a duty to fairly represent the Plaintiff at her Arbitration.

110.  The Local UAW breached its duty of fair representation to the Plaintiff where it knew VanDagens' partiality and failed to:

   a.  inform Plaintiff of the Arbitrator's conflict-of-interest and partiality;

16

> b. object to the Arbitrator;
>
> c. Notice the Arbitrator's termination.

111.    Ransom and Kolanowski intentionally concealed the Arbitrator's conflict of interest and bias against the Plaintiff, despite her repeated requests for information about the Arbitrator.

112.    Failing to inform Plaintiff about known information regarding the Arbitrator until it was too late to object to or terminate the Arbitrator was arbitrary.

113.    Failing to inform Plaintiff about known information regarding the Arbitrator until it was too late to object to or terminate the Arbitrator was so far outside a wide range of reasonableness, that it was irrational.

114.    Alternatively, the IUAW and Local UAW intentionally concealed known information about the Arbitrator from the Plaintiff based on their discriminatory and bad faith intent and that the Plaintiff would be terminated.

115.    As a result of one or more of the IUAW or Local UAW's breaches, the Arbitrator issued the Arbitration Award.

116.    The Arbitration Award found in favor of Ford and against Plaintiff.

117.    The Award was procured by corruption, fraud, or undue or where there was evident partiality or corruption in the Arbitrator.

118.    The IUAW or Local UAW's breach(es) caused Plaintiff to be denied a fair and impartial hearing.

119.    Alternatively, the IUAW or Local UAW's breach(es) caused Plaintiff to be denied an Award of backpay and reinstatement to her position.

120.    The IUAW or Local UAW's breach(es) have caused Plaintiff to suffer damages.

121.    The outcome of the arbitration would probably have been different but for the UAW's activities.

122.    Ford and the UAW agreed to VanDagens specifically for Plaintiff's Arbitration.

123.    The UAW agreed to VanDagens arbitrating Plaintiff's grievance, knowing she had never previously arbitrated a case with Ford.

124.    The UAW agreed to VanDagens arbitrating Plaintiff's grievance, knowing her brother is Doug VanDagens.

125.    Doug VanDagens is a member of Ford's Senior Management.

126.    Doug VanDagens is Global Director, Connected Services Solutions at Ford Motor Company. (Ex. B).

127.    Doug VanDagens has worked at Ford for 31 years.

128.    As an attorney, Arbitrator VanDagens owed a duty to disclose conflicts of interest.

129.    As an attorney, Arbitrator VanDagens owed a duty to avoid the appearance of impropriety.

130.    Arbitrator VanDagens is a member of the National Academy of Arbitrators. (Ex. C).

131.    Arbitrator VanDagens serves on the National Academy of Arbitrators' Board of Governors. (Ex. C).

132.   The National Academy of Arbitrators has a Code of Professional Responsibility for Arbitrators of Labor Management Disputes. (Ex. D).

133.   The National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes requires that an arbitrator disclose conflicts of interest. (Ex. D, at pp. 8-9).

134.   The National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes considers disclosures "required." (Ex. D, at p. 8).

135.   The National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes places the burden of disclosure on the arbitrator. (Ex. D, at p. 9).

136.   Under the the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes, prior to acceptance of an appointment, an arbitrator must disclose to the parties involved any close personal relationship or other circumstance, which might reasonably raise a question as to the arbitrator's impartiality. (Ex. D, at p. 9).

137.   Under The National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes, if the arbitrator believes or perceives that there is a clear conflict of interest, the arbitrator should withdraw, irrespective of the expressed desires of the parties.

138.    Under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes, Arbitrator VanDagens had a duty to disclose to Plaintiff one or more of the following:

    a.    That her brother is Doug VanDagens;

    b.    That her brother is a member of Ford's Senior Management;

    c.    That her brother is Global Director, Connected Services Solutions at Ford Motor Company. (Ex. B);

    d.    That her brother has worked at Ford for 31 years.

139.    Arbitrator VanDagens serves on the American Arbitration Association's ("AAA") National Roster of (Employment) Neutrals. (Ex. C).

140.    Arbitrator VanDagens serves on the labor arbitrator panels of the AAA. (Ex. C).

141.    The AAA has an official "Statement of Ethical Principles." (Ex. E).

142.    Arbitrators serving on the AAA's National Roster of (Employment) Neutrals have a duty to abide by the AAA Statement of Ethical Principles.

143.    Arbitrators serving on the labor arbitrator panels of the AAA have a duty to abide by the AAA Statement of Ethical Principles.

144.    Under the AAA Statement of Ethical Principles, when an arbitrator or mediator is selected from a list of potential neutrals, (s)he is required to disclose the existence of interests or relationships that are likely to affect impartiality or that might reasonably create an appearance that (s)he is biased against one party or favorable to another. (Ex. E).

145.   Under the AAA Statement of Ethical Principles, there is judicial oversight for arbitrator impartiality, as arbitrator bias is one of the grounds for vacating an award.

146.   Under the AAA Statement of Ethical Principles, Arbitrator VanDagens had a duty to disclose to Plaintiff one or more of the following:

a.   That her brother is Doug VanDagens;

b.   That her brother is a member of Ford's Senior Management;

c.   That her brother is Global Director, Connected Services Solutions at Ford Motor Company. (Ex. B);

d.   That her brother has worked at Ford for 31 years.

147.   Under the AAA Statement of Ethical Principles, there should be judicial oversight for VanDagens' breach of her duties to the Plaintiff, as arbitrator bias is one of the grounds for vacating an award.

148.   The AAA also has a Code of Ethics for Arbitrators in Commercial Disputes. (Ex. F).

149.   Canon II of the AAA Code of Ethics for Arbitrators in Commercial Disputes requires that an "disclose any interest or relationship likely to affect impartiality or which might create an appearance of partiality." (Ex. F, at Cannon II).

150.   Arbitrator VanDagens had a duty to follow the AAA Code of Ethics for Arbitrators in Commercial Disputes.

151.   Under the AAA Code of Ethics for Arbitrators in Commercial Disputes, Arbitrator VanDagens had a duty to disclose to Plaintiff one or more of the following:

a.  That her brother is Doug VanDagens;

b.  That her brother is a member of Ford's Senior Management;

c. That her brother is Global Director, Connected Services Solutions at Ford Motor Company. (Ex. B);

d. That her brother has worked at Ford for 31 years.

152. Arbitrator VanDagens serves on the labor arbitrator panels of the Federal Mediation and Conciliation Service ("FMCS"). (Ex. C).

153. The FMCS has a Code of Professional Responsibility for Arbitrators of Labor-Management Disputes of the National Academy of Arbitrators, FMCS and AAA ("FMCS Code of Professional Responsibility"). (Ex. G).

154. The FMCS Code of Professional Responsibility provides that "[e]ssential personal qualifications of an arbitrator include honesty, integrity, impartiality and general competence in labor relations matters." (Ex. G, at p. 5).

155. The FMCS Code of Professional Responsibility provides that "[a]n arbitrator shall not engage in conduct that would compromise or appear to compromise the arbitrator's impartiality." (Ex. G, at p. 6).

156. The FMCS Code of Professional Responsibility provides that "[b]efore accepting an appointment, an arbitrator must disclose directly or through the administrative agency involved, any current or past managerial, representational, or consultative relationship with any company or union involved in a proceeding in which the arbitrator is being considered for appointment or has been tentatively designated to serve. Disclosure must also be made of any pertinent pecuniary interest." (Ex. G, at p. 7).

157. The FMCS Code of Professional Responsibility provides that "[a]n arbitrator must not permit personal relationships to affect decision-making. Prior to

acceptance of an appointment, an arbitrator must disclose to the parties or to the administrative agency involved any close personal relationship or other circumstance, in addition to those specifically mentioned earlier in this section, which might reasonably raise a question as to the arbitrator's impartiality." (Ex. G, at p. 8).

158.    Under the FMCS Code of Professional Responsibility, Arbitrator VanDagens had a duty to disclose to Plaintiff one or more of the following:

    a.  That her brother is Doug VanDagens;

    b.  That her brother is a member of Ford's Senior Management;

    c.  That her brother is Global Director, Connected Services Solutions at Ford Motor Company. (Ex. B);

    d.  That her brother has worked at Ford for 31 years.

159.    Arbitrator VanDagens failed to disclose to Salahuddin that her brother is Doug VanDagens.

160.    By failing to disclose to Salahuddin that her brother is Doug VanDagens, Arbitrator VanDagens breached duties she owed Salahuddin:

    a.  as an attorney;

    b.  under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes;

    c.  under the AAA Statement of Ethical Principles;

    d.  under the AAA Code of Ethics for Arbitrators in Commercial Disputes;

    e.  under the FMCS Code of Professional Responsibility.

161.     Arbitrator VanDagens failed to disclose to Salahuddin that her brother is a member of Ford's Senior Management.

162.     By failing to disclose to Salahuddin that her brother is a member of Ford's Senior Management, Arbitrator VanDagens breached duties she owed Salahuddin:

        a.  as an attorney;

        b.  under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes;

        c.  under the AAA Statement of Ethical Principles;

        d.  under the AAA Code of Ethics for Arbitrators in Commercial Disputes;

        e.      under the FMCS Code of Professional Responsibility.

163.     Arbitrator VanDagens failed to disclose to Salahuddin that her brother is Global Director, Connected Services Solutions at Ford Motor Company.

164.     By failing to disclose to Salahuddin that her brother is Global Director, Connected Services Solutions at Ford Motor Company, Arbitrator VanDagens breached duties she owed Salahuddin:

        a.  as an attorney;

        b.  under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes;

        c.  under the AAA Statement of Ethical Principles;

        d.  under the AAA Code of Ethics for Arbitrators in Commercial Disputes;

        e.  under the FMCS Code of Professional Responsibility.

165.   Arbitrator VanDagens failed to disclose to Salahuddin that her brother has worked at Ford for 31 years.

166.   By failing to disclose to Salahuddin that her brother that her brother has worked at Ford for 31 years, Arbitrator VanDagens breached duties she owed Salahuddin:

> a.  as an attorney;
>
> b.  under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes;
>
> c.  under the AAA Statement of Ethical Principles;
>
> d.  under the AAA Code of Ethics for Arbitrators in Commercial Disputes;
>
> e.  under the FMCS Code of Professional Responsibility.

167.   Arbitrator VanDagens failed to disclose to Salahuddin she had a conflict of interest.

168.   By failing to disclose to Salahuddin that she had a conflict of interest in serving as an Arbitrator in Plaintiff's Arbitration, Arbitrator VanDagens breached duties she owed Salahuddin:

> a.  as an attorney;
>
> b.  under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes;
>
> c.  under the AAA Statement of Ethical Principles;
>
> d.   under the AAA Code of Ethics for Arbitrators in Commercial Disputes;

    e. under the FMCS Code of Professional Responsibility.

169. On January 5, 2018, Judge Sharon Johnson Coleman recused herself from the *Van* case, 14-CV-8708, N.D. Ill. (Doc. # 215), on the grounds that a family member recently became employed at Ford.

170. Arbitrator VanDagens had a duty to avoid an appearance of impropriety.

171. Arbitrator VanDagens did not recuse herself even though her family member was employed at Ford.

172. By failing to recuse herself, VanDagens breached her duty to avoid the appearance of impropriety.

173. By failing to avoid an appearance of impropriety, Arbitrator VanDagens breached duties she owed Salahuddin:

    a. as an attorney;

    b. under the National Academy of Arbitrators' Code of Professional Responsibility for Arbitrators of Labor Management Disputes;

    c. under the AAA Statement of Ethical Principles;

    d. under the AAA Code of Ethics for Arbitrators in Commercial Disputes;

    e. under the FMCS Code of Professional Responsibility.

174. The UAW agreed to VanDagens despite that VanDagens failed to abide by her ethical duties to:

    a. Disclose to Plaintiff that she had a conflict of interest;

    b. Disclose to Plaintiff that her brother was a senior management at Ford;

    c. Disclose to Plaintiff that her brother worked Ford for 31 years;

    d. Recuse herself from this arbitration;

    e. Avoid the appearance of impropriety.

175. The International UAW and Local UAW's actions agreeing to VanDagens and failing to object to her or terminate her in light of her ethical improprieties was arbitrary toward the Plaintiff.

176. Alternatively, the International UAW and Local UAW's actions agreeing to VanDagens and failing to object to her or terminate her in light of her ethical improprieties was discriminatory and in bad faith.

177. VanDagens' findings, as contained in her Award demonstrate her bias against the Plaintiff.

178. The International UAW and Local UAW's activities permitting VanDagens to issue the Award caused the biased Award to issue.

179. But-for the International UAW and Local UAW's actions, an unbiased arbitrator would have issued an award with an outcome more favorable to the Plaintiff.

180. The Arbitrator purportedly based her Award on Ms. Lee's credibility:

> Lee's testimony was direct and plausible. Each time she told her story, she repeated essentially the same account. The minor differences between Lee's sworn testimony and her interview statement do not undercut her credibility.

(Ex. A, at p. 3).

181. VanDagens' this finding was directly contradictory to Ms. Lee's statements at the Arbitration which provided:

      a.  Plaintiff was terminated based on a written report and investigation into allegations by Ms. Lee, but that at the Arbitration, Ms. Lee said what she wrote on the paper was "wrong."

      b.  At the Arbitration hearing, Ms. Lee could not remember where her supposed witness was located during the alleged confrontation, saying "I don't know. I don't know where she (Ms. William) was."

182.    The supposed witness, Ms. Trechon Williams originally provided a statement to Ford corroborating Ms. Lee's account.

183.    Ms. Williams refused to testify for Ford at the Arbitration.

184.    The International UAW and/or the Local UAW knew Ms. Williams refused to testify at the Arbitration because she did not want to provide false testimony under oath.

185.    Prior to the Arbitration, Ms. Williams told UAW Representative "Dede" that she refused to testify and corroborate Ms. Lee's allegations at the Arbitration hearing because Ms. Lee's allegations were untrue.

186.    Despite that the International UAW and/or Local UAW knew that Ms. Lee's key witness recanted her story, the UAW refused to require that Ms. Williams testify.

187.    Despite Ms. Williams' absence, and the fact that it was hearsay, the Arbitrator considered Ms. Williams' original false statement as evidence corroborating Ms. Lee's changing stories.

188.    The International UAW and Local UAW did not present witnesses to testify and corroborate that Plaintiff was working on the line during the time Ms. Lee claims she was confronted.

189.   Ford presented a witness, Supervisor Kevin Daniels, who arrived to work at or around 3:00 p.m. on the day of the alleged altercation.

190.   The Arbitrator permitted Daniels to testify even though he was not listed in Ford's witness disclosure.

191.   The Arbitrator permitted Daniels to testify regarding the time Plaintiff arrived at work, even though the time Plaintiff arrived at work was outside of Daniel's knowledge.

192.   The Arbitrator permitted Ford to take a significant recess when Daniels arrived to testify so that Ford's representative could prepare him for testifying.

193.   Daniels testified about time sheets, but the time sheets he testified about were incomplete, cut-off and did not contain Plaintiff's start-time.

194.   Daniels did not arrive to work until after the Plaintiff on the date in question.

195.   The International UAW and Local UAW failed to object to Daniels despite that he:

> a.  Did not have knowledge of the time Plaintiff arrived at work or of her activities during the 2:00 p.m. hour on the day in question;
>
> b.  Was not included on Ford's witness list;
>
> c.  Testified about time sheets that were incomplete, cut off and which did not contain Plaintiff's start time.

196.   Daniels testified that Plaintiff arrived at work at 3:00 p.m. on that date.

197.   The Arbitrator relied on Daniels' testimony to suggest that Plaintiff was not credible when Plaintiff testified she was working on her line at 2:00 p.m.

198.    The Arbitrator's reasoning was evidently biased and perverted, as even if Daniels' testimony was credible, that would mean Plaintiff was not in the building until 3:00 p.m. – 45 minutes after Ms. Lee claimed to have been confronted.

199.    The Arbitrator's credibility determination overwhelmingly in favor of Lee, despite clear contradictions between her under oath statement and prior statements and relying on Williams' hearsay statement demonstrated the Arbitrator's bias.

200.    But-for the International UAW and Local UAW permitting VanDagens to arbitrate this matter, and knowing failure to call Ms. Williams as a witness, any reasonable, non-biased arbitrator would have probably reached a different conclusion regarding whether or not Plaintiff should have been terminated.

201.    An unbiased Arbitrator would have fairly considered the inconsistencies in Ms. Lee's statements when adjudicating the credibility of her statements.

202.    The outcome of the arbitration would probably have been different if an unbiased Arbitrator made the credibility determinations.

203.    The outcome of the arbitration would probably have been different if the UAW objected to the arbitrator or timely moved to terminate the Arbitrator and replace her with an unbiased arbitrator.

204.    The outcome of the arbitration would probably have been different but for the UAW's activities.

**AN AWARD RESULTING FROM CORRUPTION, FRAUD OR UNDUE MEANS,
OR AN ARBITRATOR'S "EVIDENT PARTIALITY" SHOULD BE REMANDED[3]**

205.    The Federal Arbitration Act requires that:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;

* * *

9 U.S.C. § 10(a)(1)-(2) (2018).

206.    There was evident partiality in the Arbitration Award when it was issued by VanDagens in favor of Ford and against Plaintiff.

207.    As a result of the International UAW and Local UAW's actions, Plaintiff has been damaged.

---

[3] This subsection is repleaded only for purposes of preserving the issue for appeal as to whether the standards derived from federal law, and which have been set forth in the FAA apply to Section 301 and whether Section 301 is violated where an arbitration is conducted with evident partiality or corruption by the arbitrator, including where an Arbitrator fails to disclose that her brother is a key managerial member for one of the parties involved to the adverse real party in interest.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully requests that this Court provide the following declaratory and equitable relief:

a. Overturn, set aside and vacate the Arbitrator's Award;

b. Order a rehearing before an impartial and unbiased arbitrator;

c. Award and expenses and other costs as permitted by law;

d. Award attorneys' fees if applicable by law;

e. Grant such other relief as the Court deems equitable and just.

Alternatively, Plaintiff respectfully requests that the Court reverse the Arbitrator's findings and award Plaintiff the following:

a.  Award Plaintiff all backpay, including the value of her lost wages and benefits;

b.  Order that Plaintiff be reinstated to her position at Ford Motor Company, with restoration of her seniority rights;

c.  Award and expenses and other costs as permitted by law;

d.  Award attorneys' fees if applicable by law;

e.  Grant such other relief as the Court deems equitable and just.

Respectfully submitted,
HUNT & ASSOCIATES, P.C.

By: /s/ Keith L. Hunt (electronic signature)
An Attorney for Plaintiffs

Keith L. Hunt
Bradley E. Faber
Hunt & Associates, P.C.
55 West Monroe, Suite 3600
Chicago, Illinois  60602
(312) 558-1300

## CERTIFICATE OF SERVICE

I hereby certify that I am an attorney in this cause and that I caused to be filed

and served the attached Plaintiff's Third Amended Complaint on counsel for all parties

of record as listed below by email through the Court's CM/ECF system on July 30,

2018.

Timothy S. Millman
Nicholas Davita
BERKOWITZ OLIVER
WILLIAMS SHAW &
EISENBRANDT LLP
2600 Grand Boulevard,
Suite 1200
Kansas City, Missouri 64108
Telephone:  816.561.7007
Facsimile:  816.561.1888

Mark H. Boyle
Karen Kies DeGrand
DONOHUE BROWN
MATHEWSON & SMYTH LLC
140 South Dearborn Street, Suite 800
Chicago, Illinois 60603
Telephone:  312.422.0900
Facsimile:  312.422.0909

Joshua File
Stanley Eisenstein
Katz, Friedman, Eagle,
Eisenstein, Johnson & Bareck
77 West Washington St., 20th Floor
Chicago, IL 60602
Phone: 312.263.6330
Fax: 312.372.5555
jfile@kfeej.com