**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHRANDA CAMPBELL-SALAHUDDIN, | ) ) ) | |
| Plaintiff, | ) ) | No. 18 C 268 |
| v. | ) ) | Hon. Virginia M. Kendall |
| FORD MOTOR COMPANY; UNITED AUTO WORKERS LOCAL 588; and INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AFL-CIO, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

After the Court dismissed her Second Amended Complaint without prejudice (Dkt. 39), Plaintiff Shranda Campbell-Salahuddin ("Salahuddin") filed a Third Amended Complaint against Defendants Ford Motor Company; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("IUAW"); and IUAW's local chapter, United Auto Workers Local 588 ("Local UAW") (together, the "UAW Defendants"). (Dkt. 40). Salahuddin alleges that Ford terminated her employment without cause in violation of the Collective Bargaining Agreement between Ford and that the UAW Defendants failed in their statutory duty to fairly represent Salahuddin in her ensuing grievance challenging Ford's actions. Currently before the Court are Ford's and the UAW Defendants' Motions to Dismiss. (Dkts. 41, 44). For the reasons explained below, Defendants' motions are denied.

**BACKGROUND**

Plaintiff Shranda Campbell-Salahuddin, a former member of IUAW and Local UAW, worked for Ford for 16 years and was most recently employed at its Stamping Plant in Chicago Heights, Illinois. (Dkt. 40) at ¶¶ 9, 16–19. Starting around 2013, Salahuddin began to make repeated complaints of sexual and racial harassment, discrimination, and retaliation about fellow union employees and management to Ford and representatives of the UAW Defendants, including to Local UAW Building Chairman, Matt Kolanowski. *Id*. at ¶¶ 53–55. These complaints of harassment, discrimination, and retaliation are currently the subject of another lawsuit pending in this district, *Van v. Ford Motor Co.*, No. 14 C 8708 (N.D. Ill.). Salahuddin also made complaints about how the UAW Defendants' handled her complaints. (Dkt. 40) at ¶ 56. At some point, UAW Defendant officials, including Kolanowski and IUAW representative Reggie Ransom, "became tired" of and frustrated by her complaints and told her that the federal harassment lawsuit was going to get the plant shut down. *Id*. at ¶¶ 57–58.[1]

In 2016, Salahuddin complained about the condition of the women's restroom at the plant. *Id*. at ¶ 60. She later learned that union employee Kasha Lee got in trouble because of her complaint. *Id*. at ¶ 61. On June 22, 2016, Lee reported that Salahuddin had confronted her and deliberately bumped her as the two passed on the stairs. *Id*. at ¶ 64. Salahuddin, on the other hand, stated that she did not interact with Lee on the date in question and was at her work station at the time of the alleged bumping and two of her co-workers could attest to this. *Id*. at ¶¶ 66–67. In other words, Lee's report was false. Still, Lee's report was investigated by Labor Relations Representative Grant Crowley (presumably a Ford employee). *Id*. ¶ 70; *see* (Dkt. 51) at 3

---

[1] Salahuddin also alleges that when she "continued to complain about other union employees, the UAW acted arbitrarily and refused to adequately represent [her] in a subsequent matter." (Dkt. 40) at ¶ 59. The Third Amended Complaint is not clear as to what this allegation refers, but it does not appear to be a part of the overall grievance proceeding here.

(describing Crowley as "Ford's investigating H.R. Associate"). Even though Crowley did not interview Salahuddin's work station co-workers, he did *not* recommend termination. (Dkt. 40) at ¶¶ 71–72. On August 29, 2016, Ford terminated Salahuddin's employment anyway. *Id.* at ¶¶ 20, 73; *see also* (Dkt. 40-1) (12/13/17 Arbitration Opinion and Award) at 2.

Immediately following her termination, the UAW Defendants "consciously decided not to negotiate [Salahuddin's] reinstatement," even though Kolanowski told her that he successfully had negotiated the reinstatement of two other employees terminated for physical alterations and that he could have negotiated hers as well, except for the fact that it meant that saving her job meant that someone else would have to be fired. (Dkt. 40) at ¶¶ 74–77. The decision not to negotiate Salahuddin's reinstatement was because of her workplace complaints.[2] *Id.* at ¶¶ 79–81. Still, on the same day she was terminated, Salahuddin initiated the grievance process pursuant to the UAW Defendants' and Ford's 2015 Collective Bargaining Agreement ("CBA") and with the assistance of Local UAW. (Dkt. 40) at ¶¶ 21–26, 34, 40; *see also* (Dkt. 45-1) (excerpt of 11/5/15 Agreements between UAW and the Ford Motor Company Volume I); (Dkt. 40) at ¶¶ 34, 39–46, 102–03 (discussing and quoting sections of Article VII).

A.      The CBA

The CBA states that Ford has the right to discipline and discharge employees for cause. (Dkt. 40) at ¶ 36. Complaints that Ford disciplined or discharged an employee without cause are

---

[2] The reinstatement negotiation described in the Third Amended Complaint appears to have been something outside of the grievance rubric prescribed in the CBA described *infra*. Therefore, for the reasons discussed in this Opinion, it cannot support a fair-representation claim because it would not have had an effect on the outcome of the arbitration. *See Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1177 (7th Cir. 1995) (a plaintiff must set forth allegations from which a reasonable inference could be made "that the outcome of the arbitration would probably have been different but for the union's activities"). In any event, these failure-to-negotiate allegations are confusing in light of the Third Amended Complaint's numerous allegations regarding the grievance procedures that the UAW Defendants took in Salahuddin's matter, going all the way up to the conclusion of the Fourth Stage. *See* (Dkt. 42) at 7–8; (Dkt. 45) at 11–12.

to be taken up by way of the prescribed grievance procedure set forth in Article VII. *Id*. at ¶¶ 36, 39. To begin, Article VII states that "the Union shall . . . be the exclusive representative of the interests of each employee or group of employees covered by this Agreement, and only the Union shall have the right to assert and press against the Company any claim, proceeding or action in violation of this Agreement." (Dkt. 45-1) at 3–4. As for the grievance procedure, Article VII describes four grievance phases: First Stage Grievances, which entail oral discussions; Second Stage Grievances, which are appeals of First Stage Grievances that are not satisfactorily resolved and which entail written grievances that are presented to a company representative for presentation at a grievance meeting; Third Stage Grievances, which are appeals of unsatisfactory Second Stage Grievances to a plant appeal board that include detailed statements of fact and positions and result in a written decision by the board; and finally, Fourth Stage Grievances, which are appeals to an "impartial Umpire." *Id*. at 4–17. The Umpire's decision is "final and binding on the Union, its members, the employee or employees involved and the Company." *Id*. at 16. "The Union will discourage any attempt of its members, and will not encourage or cooperate with any of its members in any appeal to any Court or Labor Board from a decision of the Umpire." *Id*. at 16–17.

Regarding the "impartial Umpire," the CBA states that the "impartial Umpire shall be a person jointly selected by the parties and shall continue to serve only so long as he/she continues to be acceptable to both parties." *Id*. at 11, 17. The CBA appears to contemplate a single Umpire who would arbitrate all pending disputes at the Fourth Stage, although it also authorizes the selection of "one or more persons to serve as a temporary Umpire" by the union and Ford. *Id*. at 14. Also, according to the CBA, the Umpire can be terminated at any time by the written request of either party. *Id*. at 17. In terminating the Umpire, the terminating party can specify whether it

is agreeable for the Umpire to decide the cases then pending before him or her. *Id*. If the terminating party elects not to have the pending cases decided by the Umpire, all pending cases shall be referred to a successor Umpire or "to any other person the parties may agree upon." *Id*.

### B.     The Fourth Stage of Salahuddin's Grievance

Eventually the UAW Defendants appealed Salahuddin's grievance to the Fourth Stage. (Dkt. 40) at ¶¶ 26, 42, 84. Ransom prepared the grievance. *Id*. at ¶¶ 43–44. Because Ford failed to employ a permanent Umpire pursuant to the CBA, Kathryn A. VanDagens—an attorney who is associated with the National Academy of Arbitrators and other arbitration associations and who practices law in Chicago—was selected to hear Salahuddin's grievance. *Id*. at ¶¶ 27–29, 47–50, 51–52, 130, 139, 152. "Ford and UAW agreed to VanDagens specifically for [Salahuddin's] arbitration." *Id*. at 122. As relevant herein, VanDagens's brother is a member of Ford's Senior Management who has worked for Ford for more than 30 years. *Id*. at ¶¶ 124–127. VanDagens never disclosed this information to Salahuddin. *Id*. at ¶¶ 159, 161, 163, 165, 167. However, sometime around June 13, 2017, Ransom learned about VanDagens's brother. *Id*. at ¶ 87.

In connection with the arbitration hearing, Salahuddin met with Ransom on multiple dates between June and November 2017. At these meetings, she asked him for information about the arbitrator for her case. *Id*. at ¶¶ 85–86. In response to her questions, Ransom said that he did not know anything about the arbitrator and that she was "new," with Salahuddin's case being her first Ford/UAW arbitration, so no one knew anything about her. *Id*. at ¶¶ 90–93, 123. However, Ransom did know about VanDagens's brother, but he kept that information from Salahuddin at least in part because she was deposed in the *Van* case on June 27, 2017 and he did not want her to use this information as "another basis" on which to testify against Ford. *Id*. at ¶ 89.

Ransom appeared on behalf of IUAW at the arbitration hearing, which was held on October 17, 2017. *See* (Dkt. 40-1) at 1; (Dkt. 40) at ¶ 43. Kolanowski also attended the hearing. (Dkt. 40) at ¶ 94. As relevant herein, Salahuddin testified at the hearing. So did Lee and Kevin Danielson, who was Salahuddin's supervisor. *See* (Dkt. 40-1). When it was over, Kolanowski drove VanDagens to her car, and at that time VanDagens told Kolanowski that her brother worked for Ford. (Dkt. 40) at ¶¶ 95–96. After the hearing and in November 2017, Salahuddin asked Kolanowski about VanDagens; he told her he did not know anything. *Id*. at ¶¶ 97–98.

On December 13, 2017, VanDagens issued an opinion and award denying Salahuddin's grievance and concluding that Ford had cause to discharge her. *See* (Dkt. 40-1); *see also* (Dkt. 40) at ¶¶ 99, 116. Following the issuance of the award, Ransom informed Salahuddin about VanDagens's brother, but he told her that he had not objected to the conflict of interest, the award was final, and he would not assist Salahuddin in appealing the matter further. (Dkt. 40) at ¶ 101. Kolanowski, too, told Salahuddin about VanDagens's brother and his knowledge of the issue before the opinion and award was issued, but he also said that Ransom had discouraged him from sharing this information with Salahuddin and that Ransom said he would deny knowledge of VanDagens's conflict of interest. *Id*. at ¶ 100.

### C. Procedural History

On January 12, 2018, Salahuddin brought this action against Ford and the UAW Defendants. Shortly thereafter, she filed a First and Second Amended Complaint. On review of Ford's motion to dismiss her Second Amended Complaint, the Court granted the motion, dismissed the complaint without prejudice, and allowed Salahuddin to amend one more time. On July 30, 2018, she filed a Third Amended Complaint. (Dkt. 40).

Overall, the Third Amended Complaint seeks to vacate the arbitration award and for the Court to order a rehearing before an unbiased arbitrator, or alternatively, to reverse the arbitration award and find in her favor. (Dkt. 40) at 32. To this end, Salahuddin brings claims pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 *et seq*. ("LMRA"), against Ford for breach the CBA and against the UAW Defendants for violating the duty of fair representation by way of actions taken in her Fourth Stage grievance proceeding.

With regard to the latter claims, Salahuddin alleges that the UAW Defendants breached their duty of fair representation by (a) intentionally concealing and knowingly withholding VanDagens's conflict of interest from her until after the arbitration award was issued and the decision was final, (b) failing to tell her of VanDagens's conflict of interest within the timeframe to object to the arbitrator, (c) failing to object to VanDagens, (d) agreeing to VanDagens as the arbitrator even though her brother worked for Ford, and (e) failing to terminate VanDagens as the arbitrator. *Id*. at 104–11. She alleges that the UAW Defendants' acts to conceal the information about VanDagens's brother and to allow VanDagens to serve as the arbitrator, were arbitrary, discriminatory, and done in bad faith, they denied her a fair hearing, and they led to the adverse arbitration award that denied her backpay and reinstatement. *Id*. at ¶¶ 115–19, 175–76. In other words, the UAW Defendants' acquiescence allowed VanDagens to issue an award containing findings that "demonstrate her bias against" Salahuddin. *Id*. at ¶¶ 177–78. The findings evidencing bias were VanDagens's unfair credibility assessments, where she found Lee's testimony credible at the expense of Salahuddin's testimony, and where she considered evidence Salahuddin does not think she should have considered. *Id*. at ¶¶ 180–81, 201; *see id*. at ¶ 199 ("The Arbitrator's credibility determination overwhelmingly in favor of Lee, despite clear

contradictions between [Lee's] under oath statement and prior statements and [the arbitrator's] rel[iance] on Williams' hearsay statement[,] demonstrated the Arbitrator's bias.").

In addition to the VanDagens issue, Salahuddin alleges that the UAW Defendants breached their duty of fair representation through certain evidentiary failures at the hearing. In particular, the UAW Defendants failed to require that a specific key witness (Trechon Williams) testify, who had originally supported Lee's version of the events but who had later told a union representative that she would not testify at the arbitration hearing and corroborate Lee's account because Lee's "allegations were untrue." *Id*. at ¶¶ 182–86. Without her live testimony, Williams's prior statement—again, which was supportive of Lee's version of events—was considered at the hearing. *Id*. at ¶ 187. In addition, the UAW Defendants failed to (1) present witnesses who would corroborate Salahuddin's testimony that she was working at her station at the time of the alleged bumping incident on the stairs, *id*. at ¶ 188; and (2) object to the testimony of a supervisor who was not included on Ford's witness list and who lacked knowledge about the subject of his testimony, *id*. at ¶ 189–97. Through her briefing, Salahuddin focuses on the issues surrounding the Williams testimony (or lack thereof). *See* (Dkt. 51) at 5–6, 9.

In total, Salahuddin contends that "[b]ut-for the [UAW Defendants'] permitting VanDagens to arbitrate this matter[] and knowing failure to call Ms. Williams as a witness, any reasonable, non-biased arbitrator would have probably reached a different conclusion regarding whether or not [Salahuddin] should have been terminated" or would have issued an award with a more favorable outcome for Salahuddin. (Dkt. 40) at ¶¶ 179, 200; *see id*. at ¶¶ 121, 179, 202–04. All three Defendants have now moved to dismiss. *See* (Dkts. 41, 44).

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded allegations and views them in the light most favorable to the plaintiff. *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012). However, the Court need not accept as true statements of law or unsupported conclusory factual allegations. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). For 12(b)(6) motions, the Court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," as well as "additional facts set forth in [plaintiff's] district court brief . . . so long as those facts are consistent with the pleadings." *See Matthews v. Hughes*, 2015 WL 5876567, at *1 (N.D. Ill. Oct. 5, 2015) (citing *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013)) (internal alterations and quotation marks omitted).

**DISCUSSION**

Salahuddin's claims are brought as a hybrid suit under Section 301 of the LMRA. 29 U.S.C. § 185(a); *see Cleveland v. Porca Co.*, 38 F.3d 289, 296–97 (7th Cir. 1994) (union employees generally lack standing to challenge arbitration awards because they are not parties to the CBA or union-company arbitrations, but employees can challenge arbitration awards if they state a claim for breach of the duty of fair representation and that breach is integral to the breach-of-CBA claim); *see also Yeftich v. Navistar, Inc.*, 722 F.3d 911, 914 (7th Cir. 2013) ("Only when

the union fails to carry out that duty [of fair representation] may union members pursue section 301 litigation against their employer."); *Shores v. Peabody Coal Co.*, 831 F.2d 1382, 1384 (7th Cir. 1987) (articulating the same rule). To prevail on a hybrid § 301 claim, a plaintiff must demonstrate both (1) that the employer breached its collective bargaining agreement and (2) that the union breached its duty of fair representation. In other words, the breach of the union's duty of fair representation is essential to both claims. *See Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016) (the "two claims are inextricably interdependent. . . . If one claim fails, 'neither claim is viable.'") (quoting *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997)); *accord Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539, 541 (7th Cir. 2014). Here, the parties only challenge Salahuddin's showing on the fair-representation claim.

A.      **The Duty of Fair Representation**

As the exclusive bargaining representative of the employees in the bargaining unit, a union has a statutory duty fairly to represent all of those employees. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). The duty "applies to all union activity." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). Under this doctrine, the union's authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Vaca*, 386 U.S. at 177 (citing *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)). Still, a labor union "is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995); *see also Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 691 (7th Cir. 1982) ("a union

must be accorded substantial discretion in deciding whether and to what extent a particular grievance should be pursued"). Thus, a breach of the fair duty of representation "occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Yeftich*, 722 F.3d at 915 (quoting *Vaca*, 386 U.S. at 190); *accord O'Neill*, 499 U.S. at 67; *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003). "This standard strikes the proper balance between the rights of the individual members and the responsibilities of the union to the collective interests of membership." *Rupe*, 679 F.2d at 691. "[O]nly an egregious disregard for union members' rights constitutes a breach of the union's duty." *Garcia*, 58 F.3d at 1176 (citation and quotations omitted).

In addition to arbitrary, discriminatory, or bad faith conduct, a fair representation claim requires allegations that the "plaintiff was actually harmed by the union's actions." *Id.* at 1177–78. This means that a plaintiff must set forth allegations from which a reasonable inference could be made "that the outcome of the arbitration would probably have been different but for the union's activities." *Id.* at 1177; *see Rupcich*, 833 F.3d at 854 ("the union's actions must at least probably be a substantial factor in causing the plaintiff's injuries"); *Williams v. Romano Bros. Beverage Co.*, 939 F.2d 505, 508 (7th Cir. 1991) ("the plaintiff must establish that the Union's breach actually affected the outcome of the arbitration"); *see also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 568 (1976) ("where the union actually utilizes the grievance and arbitration procedures on behalf of the employee, the focus is no longer on the reasons for the union's failure to act but on whether, contrary to the arbitrator's decision, the employer breached the contract and whether there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings").

Salahuddin's Third Amended Complaint alleges all three types of behavior—arbitrary, discriminatory, and bad faith. "Each of these possibilities must be considered separately in determining whether or not a breach has been established." *Yeftich*, 722 F.3d at 916 (quoting *Neal*, 349 F.3d at 369); *see Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018) ("A plaintiff is successful in pleading a breach of the duty of fair representation if [s]he plausibly pleads a breach under *any* of the three prongs.") (emphasis in original). The appropriate inquiry under each of these prongs is somewhat different. *Bishop*, 900 F.3d at 397. A "union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational." *O'Neill*, 499 U.S. at 67 (citation and internal quotation marks omitted). Put another way, "mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *Neal*, 349 F.3d at 369 (quoting *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372–73 (1990)). "Whether a union's actions are arbitrary calls for an objective inquiry." *Id*. The standard for arbitrariness is "extremely deferential" and the Court cannot "substitut[e] [its] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Garcia*, 58 F.3d at 1177 (7th Cir. 1995) (citation omitted).

On the other hand, the inquiry for discriminatory or bad faith conduct "calls for a subjective inquiry" into the motives of the union. *Neal*, 349 F.3d at 369. It is not enough that a union's otherwise rational decision to compromise had a discriminatory impact. *See Bishop*, 900 F.3d at 398. Instead, a claim of discriminatory or bad faith conduct "requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369. If such an improper motive can be shown, it can taint a union's decision that otherwise would not constitute actionable

discrimination or be considered arbitrary. *Bishop*, 900 F.3d at 398; *see also Williams*, 939 F.2d at 507–08 (employees must allege that the union intended to deprive them of their contract rights, discriminated against them for forbidden reasons, sabotaged a possibly meritorious grievance because of personal enmity, intentionally undermined a grievance on the basis of political allegiances within the union, or otherwise intentionally caused harm to an employee through fraud, deceitful action or dishonest conduct) (citing *Martin v. Youngstown Sheet & Tube Co.*, 911 F.2d 1239, 1248 (7th Cir. 1990)).  On this factor, although a plaintiff must supply more detail than just "[b]are assertions of the state of mind," *Yeftich*, 722 F.3d at 916, a complaint might pass muster if it "offer[s] facts that suggest a motive for the union's alleged" bad-faith conduct. *Bishop*, 900 F.3d at 397 (quoting *Yeftich*, 722 F.3d at 916).  Allegations of "fraud, deceitful action or dishonest conduct" are evidence of bad faith.  *See Humphrey v. Moore*, 375 U.S. 335, 348 (1964); *see also Rupe*, 679 F.2d at 691 ("To establish bad faith or discrimination, the union member must adduce substantial evidence of fraud, deceitful action or dishonest conduct.") (citation and quotations omitted).

### 1.      UAW Defendants' Failure to Terminate VanDagens

Salahuddin's Third Amended Complaint contains allegations that, when considered as a whole, give rise to a plausible inference that the UAW Defendants' acceptance of VanDagens as the arbitrator for her matter—that is, their failure to terminate her—was arbitrary, discriminatory, or in bad faith.  Here, the CBA specified that after the Third Stage the grievance may be appealed "to the *impartial* Umpire."  (Dkt. 45-1) at 11 (emphasis added).  But Salahuddin alleges that the arbitrator selected and approved by the parties was not the "impartial" umpire as contemplated by the CBA; instead, the arbitrator had a conflict of interest by way of her sibling relationship to a long-time Ford executive.  (Dkt. 40) at ¶¶ 50–51, 125–27.  As such, Salahuddin has alleged that

this provision of the CBA was violated. (Dkt. 40) at ¶ 41; (Dkt. 51) at 3–4; *cf. Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisconsin & Its Local 5*, 724 F.3d 939, 948 (7th Cir. 2013) ("Section 301 review simply does not include a free-floating procedural fairness standard absent a showing that some provision of the CBA was violated."). Further, Salahuddin alleges that there was "evident partiality in the arbitration award." (Dkt. 40) at ¶ 206. "[E]vident partiality exists where a reasonable person would . . . conclude that an arbitrator was partial." *Vinco Painting, Inc. v. Painters Dist. Council No. 30*, 2010 WL 2891685, at *9 (N.D. Ill. July 19, 2010) (alterations and quotations omitted); *cf. Smart v. Int'l Bhd. of Elec. Workers, Local 702*, 315 F.3d 721, 724–25 (7th Cir. 2002) (district courts can look to the Federal Arbitration Act as guidance to fill in procedural gaps in LMRA actions). More specifically, evident partiality is where an arbitrator's bias is "direct, definite and capable of demonstration rather than remote, uncertain, or speculative." *Harter v. Iowa Grain Co.*, 220 F.3d 544, 553 (7th Cir. 2000) (citation and quotation marks omitted). The mere appearance of partiality is not enough.

Although accusations of arbitrator bias based solely on adverse factual findings and other rulings typically are insufficient to allege partiality, *see Mical v. Glick*, 581 F. App'x 568, 571 (7th Cir. 2014), when combined with the allegations about VanDagens's sibling relationship to one of the parties to the arbitration, Salahuddin has alleged the bare minimum to state her claim. That is, she has adequately alleged that a reasonable person would conclude that VanDagens was biased. *See Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992) ("to show evident partiality, the relationship between the arbitrator and party must be 'so intimate—personally, socially, professionally, or financially—as to cast serious doubt' on the arbitrator's impartiality.") (quoting *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th Cir. 1983)); *see, e.g., Morelite Construction Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83–84

(2d Cir. 1984) (the father-son relationship at issue was "such that reasonable people would have to believe it provides strong evidence of partiality by the arbitrator.").  Although Salahuddin will need to point to evidence of VanDagens's bias on summary judgment and conversely Defendants will be able to combat such evidence by elaborating on the specifics of VanDagens's relationship and her brother's connection to the arbitration among other things (*see* (Dkt. 53) at 3–4), the allegations of bias, taken as true for purposes of the motions to dismiss, are sufficient.

In light of these allegations, the next question is whether the UAW Defendants' failure terminate VanDagens was so egregious as to be deemed arbitrary, discriminatory, or done in bad faith.  Again, Salahuddin's allegations are sufficient to plead that it was.  First, she alleges that VanDagens was a "new" arbitrator whose first grievance would be Salahuddin's, leading to the inference that the UAW Defendants had not approved her selection prior to Salahuddin.  *See* (Dkt. 40) at ¶¶ 90–93, 123.  Next, Salahuddin has alleged facts to suggest that the UAW Defendants had a motive to act against her interest in reinstatement to her position, namely, that she is a litigant in a separate lawsuit against Ford and that she has a multi-year history of making complaints about workplace problems involving other union employees, including claims of harassment and discrimination and claims about how union officials responded to her claims.  *Id*. at ¶ 56.  Not only does Salahuddin allege that she made complaints, she alleges that she made them directly to Kolanowski and that Kolanowski and Ransom told her that the federal lawsuit was going to negatively affect the plant.  *Id*. at ¶¶ 54, 57–58.  In addition, she alleges that certain failures of the UAW Defendants in her post-termination proceedings were "because she complained too much about observed workplace problems."  *Id*. at ¶ 81.  Further, Salahuddin alleges that Ransom and Kolanowski—the same individuals who had made negative comments about her complaint activity—acted deceptively and untruthfully by refusing to tell her about VanDagens's brother

despite Salahuddin's repeated requests for information prior to the issuance of the opinion and award.[3] "Deceptive actions can be evidence of bad faith." *Yeftich*, 722 F.3d at 916; *see also Souter v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., Local 72*, 993 F.2d 595, 599 (7th Cir. 1993) (a plaintiff must link hostility to treatment by the union to show a breach of the union's duty of fair representation).

Finally, from the documents submitted to the Court, there appears to be little downside to terminating an arbitrator under the CBA, which may also be a factor in the evaluation of the union's behavior. All that is required is written notice by either party, the union or Ford, and termination is automatic and the terminating party can determine whether or not the arbitrator at issue will decide any cases then pending before him or her. (Dkt. 45-1) at 17. For this same reason, Salahuddin has adequately alleged that the UAW Defendants' failure to terminate VanDagens caused her harm. Specifically, the union's notice of termination on its own would have caused VanDagens's termination and a different arbitrator would have been selected to render a decision on Salahuddin's case. In addition, although Ford is correct that "a different arbitrator could possibly be persuaded by the same evidence" as VanDagens (*see* (Dkt. 45) at 7), Salahuddin has alleged that VanDagens was biased and that bias affected the ultimate result of the arbitration. *Cf. Williams*, 939 F.2d at 509 (7th Cir. 1991) (affirming dismissal of fair representation claim because plaintiff failed to allege how an arbitrator's conflict of interest affected the arbitration, noting that there was "no claim that the arbitrator was biased"). In this way, Salahuddin's allegations support

---

[3] Although Defendants are correct that the UAW Defendants' overall failure to apprise Salahuddin of the arbitrator's brother in and of itself does not allege a violation of the duty of fair representation because Salahuddin was not a party to the arbitration and could not have objected to or terminated VanDagens from the case, the Court still considers these allegations of deceptive and dishonest conduct in evaluating Salahuddin's allegations of motive.

the inference that, UAW Defendants' failure to terminate the arbitrator "contributed to the erroneous outcome of the contractual proceedings." *Hines*, 424 U.S. at 568.

Regarding the decision to use VanDagens as the arbitrator, UAW Defendants point to the Third Amended Complaint's allegations concerning VanDagens's qualifications and certifications and argue that VanDagens is a "highly respected labor arbitrator at the top of her profession" who is also "the cream of the crop." (Dkt. 42) at 9–10. Accordingly, the UAW Defendants argue that "it was hardly irrational for the UAW Defendants to select her, regardless of the fact that her brother works for Ford." *Id*. at 10. Although the Third Amended Complaint does contain information about VanDagens's affiliations, facts about her reputation and experience are not included and cannot be inferred from the allegations. Accordingly, while the UAW Defendants can explain their decisionmaking process and the factors they weighed in agreeing to have VanDagens arbitrate Salahuddin's grievance at the summary judgment stage, it is premature to do so at this juncture.[4] *See Nauert v. Local Union 134*, 2016 WL 344536, at *2 (N.D. Ill. Jan. 28, 2016); *see also Baldini v. Local Union No. 1095, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 581 F.2d 145, 151 (7th Cir. 1978) ("If the union has made an honest, informed, and reasoned decision not to proceed, it has not breached its duty, even though the decision leaves the individual employee without recourse, other reasonable men might have decided differently, or the union appears in hindsight to have been simply mistaken in the factual premises of its reasoning"), overruled in part on other grounds by *Rupe*, 679 F.2d 685. Further, even if rational, if such an improper motive can be shown, it can taint a union's decision that

---

[4] The same can be said about Ford's argument that Salahuddin's allegations "put the cart-before-the-horse" because they do not explain whether the UAW Defendants knew the arbitrator was actually biased and that the UAW Defendants agreed to the arbitrator knowing she would uphold Salahuddin's termination regardless of its merits. *See* (Dkt. 52) at 3. Salahuddin's allegations on these points are presumed true at this stage; Ford's arguments require a factual inquiry beyond the allegations in the complaint.

otherwise would not constitute actionable discrimination or be considered arbitrary. *Bishop*, 900 F.3d at 398. As already stated, the Third Amended Complaint plausibly suggests that the UAW Defendants had a bad faith motive.

In sum, Salahuddin's allegations of the UAW Defendants' conduct and motives are enough to survive dismissal regarding their failure to terminate the arbitrator. What primarily sets her Third Amended Complaint apart from her Second Amended Complaint in this regard are the newly added allegations concerning the UAW Defendants' bad faith motives against Salahuddin.

### 2. UAW Defendants' Failure to Tell Salahuddin about VanDagens

By contrast, Salahuddin's allegations that the UAW Defendants' failed to timely inform her about VanDagens's brother do not adequately support her claim for a breach of the duty of fair representation. First, the Court notes that the Third Amended Complaint contains numerous allegations about Ransom's and Kolanowski's bad faith on this point: their knowledge of the alleged conflict of interest; their failure to inform Salahuddin of the same, particularly when she was probing directly for information about the arbitrator; their discussion about whether or not to tell Salahuddin this information; and Ransom's statement that we would lie about it. *E.g.*, (Dkt. 40) at ¶¶ 100–01. However, the CBA clearly indicates that the only parties to the grievance arbitration were the union and Ford. (Dkt. 45-1) at 3. Further, only parties to the arbitration—the union and Ford—could terminate the arbitrator (or umpire) with written notice. *Id*. at 17; *see also* (Dkt. 53) at 7. In other words, nothing in the CBA obligates either the union or Ford to disclose this or similar information to the individual grievant (Salahuddin) nor does the CBA provide for the individual grievant to object to or seek termination of the Umpire. *See generally* (Dkt. 45-1). Accordingly, despite the allegations of bad faith already discussed, the alleged failure on behalf of the UAW Defendants to inform Salahuddin about VanDagens's brother in a timely fashion fails

to state a fair-representation claim.  It does not allege a breach of the CBA and, as Defendants correctly assert, it does not plausibly allege causation, or "that the outcome of the arbitration would probably have been different but for the union's activities."  *Garcia*, 58 F.3d at 1177; *see also* (Dkt. 42) at 9; (Dkt. 45) at 14–15; (Dkt. 52) at 2–3.  In other words, either Ransom's or Kolanowski's disclosure to Salahuddin about VanDagens's brother at a time when VanDagens still could have been terminated would not have altered the proceedings because Salahuddin had no power to object to or terminate the arbitrator.

### 3.    UAW Defendants' Evidentiary Failures

Finally, Salahuddin alleges that the UAW Defendants breached the duty of fair representation by failing to require Williams to testify at the hearing and through other evidentiary mishaps.  Overall, at least when looking into whether the UAW Defendants acted arbitrarily with regard to the alleged evidentiary failures, "[i]t is not the court's role to second-guess tactical decisions made by employees' duly appointed bargaining representative."  *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994).  However, such failures can come into consideration "when there is evidence that they are so far outside a wide range of reasonableness, that the actions rise to the level of irrational and arbitrary conduct."  *Id.* (quotation omitted).

Looking first at the issues surrounding Williams, the Third Amended Complaint specifically alleges that before the arbitration hearing Williams told a an "UAW Representative" that Lee's allegations against Salahuddin were untrue.  (Dkt. 40) at ¶ 185.  Yet, when Williams refused to testify for Ford because she "did not want to provide false testimony under oath," the UAW Defendants did not bring her in and they allowed consideration of Williams's earlier written statement, which was not consistent with her recantation.  *Id.* at ¶¶ 184, 186.  Considering the significance of Lee's testimony (*see* (Dkt. 40-1)), it seems plausible that the decision not to call a

witness who had initially supported the termination events but who had later recanted to a union representative could be considered unreasonable. Still, Ford argues that "Williams may not have recanted" if required to appear. (Dkt. 45) at 8. However, the Third Amended Complaint alleges that Williams was aware of the requirement to present testimony under oath at the hearing, she said that Lee's allegations were untrue, and she did not want to present false testimony. (Dkt. 40) at ¶¶ 184–85. With these allegations, it is possible that if Williams may have appeared and refused to answer questioning, but even that could have called her prior statement into question. So from what is alleged concerning the union's knowledge of Williams's positions, it appears plausible that her absence could have affected the result of the arbitration. In addition, Ford points out that Williams was not actually a union employee, but instead an employee of a third-party contractor and thus the UAW Defendants may not have been able to "force" her to testify. (Dkt. 45) at 8. But these allegations are outside of the pleadings. Nor can the Court make inferences in favor of the Defendants at this pleadings stage. Instead, Defendants can point to evidence concerning Williams's positions and availability at the summary judgment stage. Thus, Salahuddin has alleged sufficient facts relating to the UAW Defendants' failure to present the testimony of Trechon Williams at the hearing led to an erroneous outcome.

That being said, the Third Amended Complaint fails to allege that the other evidentiary failures—the failure to call certain witnesses who would have corroborated her account and the failure to object to the testimony of her supervisor—had a similar effect on the proceeding. Further, Salahuddin does not appear to allege that these failures were conducted with the same bad-faith motive as already discussed. Accordingly, these allegations, which amount to "mere errors of judgment," not plausibly allege arbitrary actions so as to lend support to the fair-representation claim. *See Rupe*, 679 F.2d at 692 (establishing a breach of the duty of fair

representation involves more than demonstrating mere errors of judgment); *see also Griffin*, 32 F.3d at 1083.

Overall, although the Third Amended Complaint is by no means a model pleading, with the revisions and additions made after the Court dismissed the Second Amended Complaint, it contains sufficient allegations to state a claim for breach of the UAW Defendants' duty of fair representation with respect to the unions' failure to terminate the arbitrator and the unions' failure to present Williams's testimony at the hearing. As such, Salahuddin's claims regarding the handling of her grievance may proceed. Ultimately, a determination of whether the UAW Defendants acted in an arbitrary or discriminatory fashion or in bad faith involves a factual inquiry beyond the allegations in the complaint. *See, e.g.*, *Nauert*, 2016 WL 344536, at *2. Of course, Salahuddin will have to adduce facts supporting her claims to survive summary judgment.

## CONCLUSION

For reasons stated above, Defendants' Motions to Dismiss (Dkts. 41, 44) are denied.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: January 11, 2019

21