IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHRANDA CAMPBELL-SALAHUDDIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:18-cv-00268 |
| ) | |
| FORD MOTOR COMPANY; ) | Honorable John F. Kness |
| UNITED AUTO WORKERS LOCAL 588; ) | |
| and INTERNATIONAL UNION, UNITED ) | |
| AUTOMOBILE, AEROSPACE AND ) | |
| AGRICULTURAL IMPLEMENT WORKERS ) | |
| OF AMERICA (UAW), AFL-CIO, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Shranda Campbell-Salahuddin (Salahuddin), by recruited counsel, Ronald Austin, Jr., presents this response in opposition to the Motion for Summary Judgment filed by Ford Motor Company.

**INTRODUCTION**

Salahuddin is a former employee of Ford Motor Company. Ford Facts[1] ¶ 4. She was terminated on August 29, 2016, after nearly 15 years of employment with Ford. Pl. Facts ¶ 24.[2] Ford terminated Salahuddin's employment for allegedly bumping the left shoulder of Kasha Lee, an employee of ABM, Ford's janitorial contractor. *Id*. ¶ 1. Lee alleged that the incident took place in the K30 stairwell at Ford's Chicago Stamping Plant (Plant). *Id*. Salahuddin denied the alleged bumping incident ever occurred. *Id*. ¶ 5.

---

[1] References to "Ford Facts ¶ __" are to Defendant Ford Motor Company's Statement of Undisputed Material Facts In Support of Its Motion for Summary Judgment.

[2] References to "Pl. Facts ¶ __" are to Plaintiff's Statement of Additional Material Facts Requiring the Denial of Ford's Motion for Summary Judgment.

After her termination, Salahuddin filed a grievance through her union, Local 588 of the United Auto Workers Union (Local UAW), and ultimately, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (IUAW)[3] appealed the grievance to the Fourth Stage, arbitration. Ford Facts ¶ 43. Ford and the IUAW selected Kathryn A. VanDagens to serve as the arbitrator. *Id.* ¶¶ 44-48. Salahuddin's arbitration hearing was VanDagens' first arbitration between Ford and the IUAW. Pl. Facts ¶ 10. Before selecting VanDagens to serve as the arbitrator, Ford and the IUAW were aware that VanDagens had a conflict of interest because her brother, Doug VanDagens, was a 31-year employee and current Global Director at Ford. Ford Facts ¶ 46 and Pl. Facts ¶ 13.

Despite Salahuddin's repeated requests to the UAW Defendants for information about VanDagens, no one told Salahuddin about VanDagens' conflict of interest until after the Arbitration Opinion and Award (Opinion) was issued. Pl. Facts ¶¶ 10, 12-13. On December 13, 2017, VanDagens denied Salahuddin's grievance and upheld her termination. Ford Facts ¶ 52. VanDagens' Opinion demonstrates her bias in favor of Ford.

The UAW Defendants failed to fairly represent Salahuddin by selecting VanDagens as the arbitrator and failed to investigate and present evidence at the hearing that would have defeated Ford's claims. Moreover, Ford unjustly terminated Salahuddin's employment, without cause, in violation of the Collective Bargaining Agreement (CBA). Therefore, Ford's motion for summary judgment should be denied.

---

[3] The IUAW and Local UAW are collectively referred to as "UAW Defendants."

2

## STATEMENT OF FACTS

Pursuant to Local Rule 56.1, Salahuddin responded to Ford's Statement of Material Facts and filed a Statement of Additional Material Facts. Salahuddin incorporates the undisputed Material Facts and her Statement of Additional Facts in this response brief.

## STANDARD OF REVIEW

This court can only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56 (a). All inferences are made in the light most favorable to the nonmoving party. *Illinois v. Bowen,* 808 F.2d 571, 575 (7th Cir.1986). If the evidence supports different inferences, the court must deny the motion. *Dowden v. Polymer Raymond Inc.,* 966 F.2d 1206 (7th Cir. 1992). If the court has any doubt about the existence of a genuine issue, the court must resolve that doubt against the moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 256 (1986).

## ARGUMENT

**A.     Salahuddin has standing to bring this action because the UAW Defendants breached their duty to fairly represent her.**

Salahuddin filed a hybrid suit under Section 301 of the Labor Management Relations Act. 29 U.S.C. § 185(a). Union employees generally lack standing to challenge arbitration awards because they are not parties to the CBA or union-company arbitrations. However, employees can challenge arbitration awards if they establish that the union breached its duty of fair representation. *See Cleveland v. Porca Co.*, 38 F.3d 289, 296-97 (7th Cir. 1994). *See also, Yeftich v. Navistar, Inc.*, 722 F.3d 911, 914 (7th Cir. 2013) (holding that when the union fails to carry out its duty of fair representation, union members may pursue section 301 litigation against their employer).

3

To prevail on a hybrid § 301 claim, a plaintiff must demonstrate that the employer breached its collective bargaining agreement and that the union breached its duty of fair representation. *Truhlar v. U.S. Postal Service*, 600 F.3d 888, 891-92 (7th Cir. 2010). The union breaches its duty of fair representation when its conduct is either arbitrary, discriminatory, or in bad faith. *Id*.

Here, the UAW Defendants breached their duty to fairly represent Salahuddin by: (1) failing to select an "impartial" arbitrator; (2) intentionally concealing the arbitrator's conflict of interest and (3) failing to present evidence that would have easily confirmed Salahuddin's version of events. The UAW Defendants' actions were arbitrary and in bad faith.

1. The UAW Defendants Failed to Select an Impartial Arbitrator

Article VII, Section 8 of the CBA states that "If a satisfactory disposition is not made of a grievance . . . the case may be appealed . . . to the impartial Umpire." Pl. Facts ¶ 14. An "impartial Umpire[4] shall be a person jointly selected by the parties and shall continue to serve only so long as he/she continues to be acceptable to both parties." *Id*. The Umpire can be terminated at any time by the written request of either party. *Id*. When terminating the Umpire, the terminating party must specify whether the Umpire will decide the case then pending before him or her. Pl. Facts ¶ 15. If the terminating party elects not to have the pending case decided by the Umpire, the case shall be referred to a successor Umpire or "to any other person the parties may agree upon." *Id*.

Ford and the IUAW selected VanDagens to serve as the arbitrator to hear Salahuddin's grievance. Ford Facts ¶ 48. VanDagens was selected even though she disclosed to Ford and the UAW Defendants that she had a conflict of interest. When Ford contacted VanDagens about

---

[4] The CBA uses the word "umpire." In this brief, "umpire" and "arbitrator" are used interchangeably.

4

serving as an arbitrator, VanDagens immediately disclosed, in an email dated June 13, 2017, that she had a conflict because her brother, Doug VanDagens, is a Global Director at Ford. Ford Facts ¶ 46. Doug VanDagens was a 31-year employee of Ford. Pl. Facts ¶ 13. VanDagens' email was forwarded to the IUAW. Ford Facts ¶ 47. Despite the conflict of interest, Ford and the UAW Defendants agreed to use VanDagens as the arbitrator. *Id.* at ¶ 48. Neither Ford nor the UAW Defendants disclosed VanDagens' conflict of interest to Salahuddin before the hearing. Pl. Facts ¶¶ 10-13.

On December 13, 2017, VanDagens issued her Opinion. The Opinion demonstrates that her conflict of interest prevented her from being impartial. For example, early in the "Discussion and Finding Section" of the Opinion, VanDagens states, "There is no doubt that [Salahuddin] would have incentive to fabricate her story – as the accused she stands to gain or lose the most here." Pl. Facts ¶ 35. These are not the words of an impartial arbitrator.

Next, VanDagens states that she found Lee's account of the alleged bumping incident more credible than Salahuddin's denial. The Opinion states, "Each time [Lee] told her story, she repeated essentially the same account. The minor differences between Lee's sworn testimony and her interview statement do not undercut her credibility." Pl. Facts ¶ 36. VanDagens made this credibility determination despite the fact that Lee changed her story during cross-examination after it became obvious that her version of events was impossible.

In two written statements, in a sketch that Lee drew, and on direct examination, Lee claimed that she was walking down the stairs along the left railing. Pl. Facts ¶ 3. Lee also stated that Salahuddin was walking up on the right side of the stairs when Salahuddin bumped Lee's *left* shoulder. *Id.* It would have been impossible for Salahuddin to bump Lee's *left* shoulder if Lee is walking down the stairs along the *left* railing. On cross-examination, Lee changed her testimony to say she was on the right (not left) side of the stairs and that Salahuddin was on the

left side of the stairs. Remarkably, even after Lee changed a crucial detail that made her version of events impossible, VanDagens still determined that Lee was more credible than Salahuddin.

VanDagens also relied upon written statements from Lee's witness, Trechon Williams, even though Williams did not testify at the arbitration hearing. Pl. Facts ¶¶ 18, 34. Grant Crowley, the investigator who interviewed Williams, also did not testify at the hearing to authenticate Williams' statements. Pl. Facts ¶ 34. Therefore, Williams' statements are hearsay and should not have been considered by VanDagens.

VanDagens' Opinion acknowledges that Williams "did not testify [at the arbitration hearing] but was interviewed by the Company." Pl. Facts ¶ 34. The Opinion then quotes directly from Williams' statements. *Id.* The Opinion states that, "Williams' statement corroborates Lee's testimony that [Salahuddin] intentionally bumped Lee." Pl. Facts ¶ 36. VanDagens ignored the fact that Williams' written statement contained the same false information that Lee's written statements contained. Williams' statement reflects that Lee was on the left side of the stairs and Salahuddin was on the right side. Pl. Facts ¶ 4. But Lee changed her testimony at the hearing to say that she was walking on the right side of the stairs, instead of the left side. Pl. Facts ¶ 19. Therefore, Williams' written statement does **not** corroborate Lee's claims. Williams' statement contradicts Lee's testimony.

In her Opinion, VanDagens suggests that Lee had no motive to make-up her claim and Ford had no motive to terminate Salahuddin. But VanDagens ignores the fact that Salahuddin complained about the condition of the women's restroom, which Lee and Williams were assigned to clean. Pl. Facts ¶ 32. VanDagens also ignored the fact that Salahuddin filed an EEOC Charge against Ford. Pl. Facts ¶ 30. On February 20, 2015, the EEOC found "reasonable cause" to believe that Ford discriminated against Salahuddin based on her sex and retaliated against her for engaging in protected activity. *Id.* Even after the EEOC Determination was

6

made, Ford continued to discriminate, harass, and retaliate against Salahuddin. In three letters written to Anita O'Connor in Ford's Labor Relationship Department, Salahuddin complains about continued discrimination, harassment, and retaliation at Ford. Pl. Facts ¶ 31. The letters are dated March 4, March 28, and April 20, 2016. *Id.* The last letter is dated two months before the alleged bumping incident that ended in Salahuddin's termination.

In its motion, Ford argues that Doug VanDagens had no involvement in the decision to terminate Salahuddin and no involvement in the arbitration hearing. *See* Ford's Motion at 7. Ford misses the point. Salahuddin does not argue that Doug VanDagens acted improperly. However, his sister had a conflict of interest that prevented her from serving as an impartial arbitrator. VanDagens' conflict of interest caused her to make credibility determinations in favor of Ford, and ultimately rule against Salahuddin. That is the danger of selecting an arbitrator who has a conflict of interest.

VanDagens' conflict of interest caused her to overlook and ignore the flaws in Ford's evidence and the strength of Salahuddin's evidence. A reasonable jury could conclude that VanDagens' conflict of interest and bias in favor of Ford affected her ruling and prevented Salahuddin from receiving a fair arbitration hearing. Thus, the UAW Defendants breached their duty to fairly represent Salahuddin.

    2. <u>The UAW Defendants concealed VanDagens' conflict of interest from Salahuddin.</u>

Reggie Ransom is the IUAW's Assistant Director who represented Salahuddin at the arbitration hearing. Pl. Facts ¶ 10. Ransom received an email from VanDagens dated June 13, 2017 in which she disclosed to Ford and the IUAW that her brother works for Ford. Ford Facts ¶¶ 46-47. After conferring with Ford, Ransom consented to VanDagens serving as the arbitrator for Salahuddin's arbitration hearing. Ford Facts ¶ 48.

Salahuddin met with Ransom several times to prepare for the arbitration hearing. Pl. Facts ¶ 10. At each meeting, Salahuddin asked Ransom if he had any information about VanDagens. *Id*. Ransom told Salahuddin that he did not know anything about VanDagens because she was "new" and Salahuddin's case was VanDagens' first Ford/UAW arbitration. *Id*. Ransom's statement to Salahuddin that he knew nothing about VanDagens was false.

Matt Kolanowski, the Local UAW Bargaining Chairman, attended Salahuddin's arbitration hearing. Pl. Facts ¶ 11. After the hearing, Kolanowski drove VanDagens to her car. *Id*. During the car ride, VanDagens told Kolanowski that her brother works for Ford. *Id*. Kolanowski told Ransom about his conversation with VanDagens and the fact that her brother is a Global Director at Ford. Pl. Facts ¶ 12. Ransom told Kolanowski not to tell Salahuddin about VanDagens' brother. *Id*.

On December 13, 2017, VanDagens issued her Opinion, which denied Salahuddin's grievance. Ford Facts ¶ 52. After the Opinion was issued, Ransom called Salahuddin to inform her that VanDagens' denied the grievance. Pl. Facts ¶ 12. Ransom also said he would not appeal the decision. *Id*. Salahuddin then called Kolanowski and asked him if there was anything she could do to fight the decision. *Id*. During this call, Kolanowski told Salahuddin that VanDagens' brother works for Ford. *Id*. When Salahuddin asked why no one told her about VanDagens' conflict of interest, Kolanowski said Ransom told him not to tell Salahuddin. *Id*.

Salahuddin immediately called Ransom. Pl. Facts ¶ 13. Ransom admitted that he knew, before the arbitration hearing, about VanDagens' brother. *Id*. Ransom also admitted that he did not object to VanDagens serving as the arbitrator. *Id*.

The UAW Defendants' actions – intentionally concealing VanDagens' conflict of interest from Salahuddin – were in bad faith. Before the Opinion was issued, Salahuddin repeatedly asked Ransom for information about VanDagens. Ransom lied and said he knew nothing about

8

VanDagens. Moreover, Ransom instructed Kolanowski not to inform Salahuddin about VanDagens' conflict of interest. Instead of acting in Salahuddin's best interest, Kolanowski concealed the information he learned about VanDagens' brother being a Global Director at Ford. If Ransom and Kolanowski had disclosed VanDagens' conflict of interest before the Opinion was issued, Salahuddin could have convinced Ransom to object to VanDagens serving as the arbitrator, which would have prevented VanDagens from issuing the Opinion.

Under the CBA, either party could terminate VanDagens **at any time before the Opinion was issued**. Pl. Facts ¶ 14. All that is required is written notice by a party, and termination is automatic. *Id*. The terminating party determines whether the arbitrator can decide the case pending before him or her. Pl. Facts ¶ 15.

Ransom, being the IUAW Assistant Director, was certainly aware of the CBA rules, which explains why he refused to disclose the truth about VanDagens, and instructed Kolanowski not to disclose VanDagens' conflict of interest, until *after* VanDagens issued her Opinion. Only after the Opinion was issued did Ransom inform Salahuddin that he knew VanDagens had a conflict of interest. "Deceptive actions can be evidence of bad faith." *Yeftich*, 722 F.3d at 916. There is no question that the UAW Defendants' actions were deceptive and their actions constitute bad faith. Moreover, a reasonable jury could conclude that the lies and concealment by Ransom and Kolanowski were in bad faith and breached the UAW Defendants' duty to fairly represent Salahuddin.

   3. The UAW Defendants failed to present evidence that would have confirmed Salahuddin's version of events.

Salahuddin has consistently stated that she was not in the K30 stairwell at 2:10 p.m. on June 22, 2016, and did not bump into or have any other physical altercation with Lee. Pl. Facts ¶ 5. On June 22, 2016, Salahuddin started her line, Line 3, on time when her shift began at 2 p.m.

Pl. Facts ¶¶ 5-6. Lee claimed that, at 2:10 p.m., Salahuddin bumped Lee's left shoulder in the K30 stairwell. Pl. Facts ¶ 1. If Salahuddin was working on Line 3 at 2 p.m., she could not have bumped into Lee at 2:10 p.m. in the K30 stairwell, which is a considerable distance from Line 3. Pl. Facts ¶ 7.

To fairly represent Salahuddin, the UAW Defendants needed to gather and present evidence that Salahuddin was working on Line 3 at 2 p.m. when her shift began, and was not in the K30 stairwell at 2:10 p.m. There were at least three sources of evidence the UAW Defendants failed to investigate and present at the arbitration hearing: (1) the swipe card records; (2) video records; and (3) key witnesses.

In order to enter the Plant, Salahuddin had to use her identification card to swipe-in. Pl. Facts ¶ 17. A review of Ford's card swipe system would reveal what time Salahuddin arrived at work. If Salahuddin arrived at work in enough time to begin her shift at 2 p.m., that evidence would support Salahuddin's defense. If Salahuddin did not arrive at work until 3 p.m., as Ford claims, without any evidence, she could not have been in the K30 stairwell at 2:10 p.m. to bump into Lee. Incredibly, the UAW Defendants never presented ID swipe records at the arbitration hearing, even though Salahuddin asked Ford and the UAW Defendants to review this evidence. Pl. Facts ¶ 17.

Next, the UAW Defendants never presented video evidence at the arbitration hearing. Pl. Facts ¶ 16. It is undisputed that video cameras are located throughout the Plant. Pl. Facts ¶ 27. In fact, Ford presented testimony about other employees who were terminated after they were caught on video fighting inside the Plant. *Id*. Ford concedes that no cameras captured the alleged bumping incident in the K30 stairwell that Lee described. *Id*.

Salahuddin specifically asked Ford to review the videos to prove that she was at her Line on time and did not have an encounter with Lee on June 22, 2016. Pl. Facts ¶ 16. But the UAW

Defendants never presented video evidence showing Salahuddin arriving to work and walking to her workstation on Line 3. *Id*. Such video evidence would establish the time Salahuddin arrived at work, the time she went to her line, and who, if anyone, she interacted with that day. *Id*. The UAW also failed to present video evidence regarding whether Lee was in the K30 stairwell at 2:10 p.m. when the alleged incident took place. *Id*. Because the UAW Defendants failed to present any video evidence that would have easily defeated the claims against Salahuddin, they breached their duty to fairly represent Salahuddin.

Finally, the UAW Defendants failed to call key witnesses at the arbitration hearing, including Trechon Williams. Pl. Facts ¶ 18. Williams and Lee were friends. Pl. Facts ¶ 4. Lee identified Williams as a witness to the alleged bumping incident. *Id*. Williams allegedly gave written statements dated June 28 and 29, 2016 to Grant Crowley, Ford's Labor Relations representative. *Id*. Williams' statements mirror and support Lee's version of the bumping incident. *Id*. But the UAW Defendants did not call Williams to testify at the arbitration hearing, even though Ransom knew that Lee's version of the bumping incident was impossible. Pl. Facts ¶ 18.

As discussed above, Lee's written statements claimed that she was walking down the stairs along the left railing, Salahuddin was walking up the stairs to the right of Lee, and Salahuddin bumped Lee's *left* shoulder. Pl. Facts ¶ 3. Lee also drew a sketch showing herself on the left and Salahuddin on the right of the stairs. *Id*. On direct examination at the arbitration hearing, Lee gave the same testimony. *Id*.

Early in his cross-examination, Ransom took Lee to the K30 stairwell to demonstrate the alleged bumping incident. Pl. Facts ¶ 19. After the demonstration, Lee admitted that what she wrote in her statements, what she drew in her sketch, and what she said during direct examination were false. *Id*. Lee made this admission when she realized that Salahuddin could

11

not have bumped her *left* shoulder if Lee was walking down the stairs along the *left* railing. Accordingly, Lee was forced to change her story. After the demonstration, Lee testified that she was on the *right* side of the stairs and Salahuddin was on the left side. *Id*.

Williams' written statements were consistent with Lee's written statements. Williams' statements claimed that Lee was walking down the left side of the stairs, Salahuddin was walking up on the right side of the stairs, and Salahuddin bumped Lee's left shoulder. Pl. Facts ¶ 4. Had Ransom called Williams to testify at the arbitration hearing, he could have undermined Williams' statements or caused her to change her testimony, like Lee changed her testimony. This would have damaged Williams' credibility, which was crucial because Williams was the only witness to the alleged bumping incident. By not calling Williams as a witness at the arbitration hearing, the UAW Defendants failed to fairly represent Salahuddin.

The UAW Defendants' failure to select an impartial arbitrator, their decision to lie and conceal VanDagens' conflict of interest from Salahuddin, their failure to present evidence that would have confirmed Salahuddin's version of events, and their failure to call the only witness to the alleged event at the arbitration hearing establish that they failed to fairly represent Salahuddin.

**B.  Ford breached the Collective Bargaining Agreement by terminating Salahuddin without cause**.

Under the CBA, Ford may "discharge employees for cause, provided that in the exercise of this right it will not act wrongfully or unjustly or in violation of the terms of this Agreement." Ford Fact ¶ 36. When Ford terminated Salahuddin, it violated the CBA by wrongfully and unjustly terminating her employment without cause.

Ford states that it terminated Salahuddin for assaulting Lee. Ford Facts ¶ 33. But the evidence Ford collected during its investigation does not support a "for cause" termination. Ford

had the following information when it terminated Salahuddin's employment. Lee reported that on June 22, 2016, at 2:10 p.m., Salahuddin bumped her left shoulder in the K30 stairwell. Pl. Facts ¶ 1. Lee rated the bump's intensity a 3 out of 10. *Id.* Lee's friend, Trechon Williams, claimed to have witnessed the alleged bumping incident. Pl. Facts ¶ 3.

Ford also knew Salahuddin denied the incident ever took place. Pl. Facts ¶ 4. Salahuddin told Ford that she never encountered Lee in the stairwell that day. *Id.* Salahuddin told Ford that she does not use the K30 stairwell to reach her workstation on Line 3. Pl. Facts ¶ 6. Instead, Salahuddin uses the K9 stairwell which takes her right to her workstation. *Id.* ¶ 7. Salahuddin's shift began at 2 p.m. and she informed Ford's investigator, Grant Crowley, that she was at work, on Line 3, at 2 p.m. Pl. Facts ¶ 5. Therefore, she could not have bumped into Lee in the K30 stairwell at 2:10 p.m.

Ford's records support Salahuddin's claim that she started her Line at 2 p.m. on June 22, 2016. Ford's Employee Work History Information, dated December 21, 2016, reflects that Salahuddin worked, and was paid for, 12.8 hours on June 22, 2016, the maximum hours an employee can receive in one day. Pl. Facts ¶ 8. Despite evidence from Ford's own records that Salahuddin worked a full 8-hour regular shift plus overtime on June 22, 2016, Ford argues that Salahuddin was one hour late to her Line. Ford makes this unsubstantiated claim so it can argue that Salahuddin could have been in the K30 stairwell at 2:10 p.m.

Interestingly, Ford cites no evidence that Salahuddin was late to her line on June 22, 2016. Instead, Ford cites to an unidentified male co-worker who allegedly said Salahuddin is "often away from the line" and is "frequently late." Ford Facts ¶ 27-28. These unsworn statements from an unidentified speaker are inadmissible and must be disregarded by this Court. Moreover, even if the statements were admissible, they do not establish that Salahuddin was late to work on June 22, 2016.

13

Undaunted in its effort to terminate Salahuddin, Ford produced an Employee Absence Information page dated February 14, 2017 that listed a 1.0 hour "G" code for Salahuddin on June 22, 2016. Pl. Facts ¶ 20. Kevin Danielson, Salahuddin's supervisor testified that he gave Salahuddin the 1.0 hour "G" code, but he did not recall why. Danielson testified that he did not know if Salahuddin was late for work on June 22, 2016. Pl. Facts ¶ 23. Danielson also did not know if Salahuddin "left the line" that day. *Id.* ¶ 23.

Moreover, a "G" code is used when an employee goes home early. *Id.* ¶ 21. An "L" code means an employee is late. *Id.* When asked about the "G" code that appears on the Employee Absence Information page, Danielson said it means Salahuddin "was either late or she left early." Pl. Facts ¶ 22. Rebecca Taylor, Ford's Human Relations supervisor testified that a "G" code is a "go-home" code. Pl. Facts ¶¶ 24-25. Regarding the "G" code on Salahuddin's Employee Absence Information page, Taylor testified that it "could have been changed after the fact." Pl. Facts ¶ 25.

Taylor made the decision to terminate Salahuddin's employment. Pl. Facts ¶ 24. Taylor terminated Salahuddin even though she admits she had no proof Salahuddin was late for work, was away from her work area, or bumped Lee in the stairwell on June 22, 2016. Pl. Facts ¶¶ 24-26. Taylor admits that Danielson never told her that Salahuddin was late to work on June 22, 2016. Pl. Facts ¶ 26. Taylor also acknowledges that Ford had cameras throughout the Plant, but no cameras captured the alleged bumping incident that Lee described. Pl. Facts ¶ 27. Salahuddin requested that Ford check its ID swipe data and video cameras to verify that she was at work on time and was not in the K30 stairwell on June 22, 2016. Pl. Facts ¶¶ 16-17. However, there is no evidence that Taylor or anyone else at Ford reviewed this information. *Id.*

With no proof to support Lee's claim against Salahuddin, Ford somehow managed to conclude that Salahuddin "intentionally" bumped Lee's shoulder and, therefore, she had to be

14

terminated. Ford Facts ¶ 33. Given that Salahuddin denied that the bumping incident took place, the fact that there was no video evidence of the alleged incident, the fact that neither Danielson nor Taylor had any evidence that Salahuddin was late to work or away from her line, and the fact that Ford paid Salahuddin for 12.8 hours, the maximum number of hours available to an employee in one day, Ford failed to establish that it terminated Salahuddin "for cause." Therefore, Ford violated the CBA by wrongfully and unjustly terminating Salahuddin's employment.

## CONCLUSION

The evidence establishes that the UAW Defendants failed to fairly represent Salahuddin by failing to select an impartial arbitrator, lying about and concealing VanDagens' conflict of interest, failing to present evidence that would have confirmed Salahuddin's version of events, and failing to call the only witness to the alleged bumping incident. The evidence also establishes that Ford violated the CBA by terminating Salahuddin's employment without cause. For these reasons, Ford's motion for summary judgment should be denied.

Respectfully submitted,

**SHRANDA CAMPBELL-SALAHUDDIN**

By: /s/ Ronald Austin, Jr.

Ronald Austin, Jr. (IL 6242453)
GRANT LAW, LLC
230 West Monroe Street, Suite 240
Chicago, IL 60606
(312) 551-0111
raustin@grantlawllc.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 6, 2020, he electronically filed **PLAINTIFF'S RESPONSE IN OPPOSITION TO FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT** with the Court, a copy of which will be served on all counsel via the Court's CM/ECF System.

By: /s/ Ronald Austin Jr.

Ronald Austin Jr. (6242453)
GRANT LAW, LLC
230 West Monroe Street, Suite 240
Chicago, Illinois 60606
(312) 551-0111
raustin@grantlawllc.com